[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 14-10742

_____

D.C. Docket No. 1:12-cv-20038-FAM

ANNE (SANDY) BATCHELOR-ROBJOHNS,
et al.

Plaintiffs-Appellees
Cross-Appellants,

versus

UNITED STATES OF AMERICA,

Defendant-Appellant
Cross-Appellee.

_____

Appeals from the United States District Court
for the Southern District of Florida

_____

(June 5, 2015)

Before MARTIN and DUBINA, Circuit Judges, and RODGERS,[*] District Judge.

RODGERS, District Judge:

_____
[*] Honorable Margaret C. Rodgers, Chief United States District Judge for the Northern District of Florida, sitting by designation.

This is an appeal of a federal income tax refund suit filed by the Estate of George Batchelor ("Estate").[1]   Counts I and II of the Estate's three-count Complaint involve Batchelor's personal income taxes for 1999 and 2000.  Count III concerns the Estate's attempt to claim a credit for its 2005 income taxes for payments it made in settlement of various lawsuits against Batchelor.  The district court entered judgment in favor of the Estate on Counts I and II and in the government's favor on Count III.  The Estate appeals the district court's judgment as to Count III, which we affirm, and the government appeals as to Counts I and II, which we reverse.

## I.    Background

George Batchelor passed away in July 2002.  Prior to his death, he owned all of the stock in International Air Leases, Inc. ("IAL"), an aviation business which bought, sold, repaired, serviced, and leased aircraft and aircraft parts.  On February 10, 1999, Batchelor sold his IAL stock to International Air Leases of Puerto Rico, Inc. ("IALPR"), for approximately $502 million.[2]  As part of the transaction, IALPR gave Batchelor a promissory note for $150 million ("Note"), which was secured by IAL assets that had been transferred in the sale, such as aircraft planes

---

[1] The Complaint was filed by Plaintiffs Anne-Batchelor-Robjohns, Daniel J. Perraresi, and Father Patrick O'Neill, as co-personal representatives of the Estate of George E. Batchelor.  The Court refers to Plaintiffs collectively as "the Estate."

[2] Batchelor's cost basis in his stock was $35,000.  Thus, nearly the entire sales price represented long-term capital gain.

and engines ("Option Assets").  Batchelor retained an option to buy back the Option Assets, and the parties agreed that if Batchelor exercised the option, they would reduce the balance of the $150 million Note by a certain negotiated price for each asset.  On April 1, 1999, Batchelor exercised his option and purchased the Option Assets for approximately $92.5 million, which reduced the balance on the Note by that amount.  IALPR paid off the Note in August 2000.[3]  As a result of the transaction, Batchelor received capital gains and interest income, and IAL realized a capital gain through its sale of the Option Assets.  On his 1999 personal income tax return, Batchelor declared the income he received from the sale in 1999, approximately $483 million, as capital gain, and paid capital gains tax on the proceeds.[4]  On his 2000 personal income tax return, Batchelor declared $18.8 million of the sale proceeds as capital gain, and an additional $5.8 million as interest income on the Note.

In February 2002, IAL was placed into involuntary bankruptcy.  The IRS determined that IAL was liable for approximately $100 million in unpaid taxes, largely as a result of its attempt to use a tax shelter scheme after the stock sale, and

---

[3] The government claims, and the district court found, that Batchelor received $131.2 million of the $150 million Note in 1999 and $24.7 million in 2000.  Although the total amount Batchelor received exceeds the $150 million face value of the Note, $5.8 million of the amount received in 2000 represented interest on the Note, which Batchelor reported as ordinary income.

[4] It was later stipulated that Batchelor should have reported part of the 1999 income (about $6.5 million) from payments on the Note as interest income.

issued a notice of deficiency for that amount. Although there was never any suggestion that Batchelor was involved in the scheme, the government nevertheless sought to collect IAL's corporate income tax obligation directly from Batchelor under a transferee liability theory.[5] This suit is referred to as "*Batchelor I.*"

In *Batchelor I*, the government attempted to prove that the sale of the IAL stock rendered IAL insolvent because the transferring parties undervalued the Option Assets by approximately $23.5 million, such that Batchelor received excess consideration relative to the actual fair market value of the IAL stock. The government sought to establish the relative values of the IAL stock and Option Assets through expert testimony. The district court, however, struck the experts based on the government's failure to comply with the expert disclosure requirements under the civil rules of procedure, and granted summary judgment in the Estate's favor. Consequently, the value of the Option Assets was not decided in *Batchelor I*.

In December 2004, the government sued the Estate based on its determination that Batchelor had underreported his capital gains in conjunction with the IAL sale on his 1999 and 2000 personal income tax returns. This suit is

---

[5] Under 26 U.S.C. § 6901, the government may collect a tax liability that a taxpayer cannot pay from a transferee who has received assets from the taxpayer. Here, the government sought to collect IAL's unpaid corporate income tax from Batchelor, and subsequently from his Estate, pursuant to 28 U.S.C. § 3304(b)(1)(B), which provides that certain transfers for less than fair market value will be considered fraudulent as to a debt to the United States.

referred to as "*Batchelor III.*"   In that suit, the government argued, as it did in *Batchelor I*, that Batchelor had undervalued the Option Assets by $23.5 million, resulting in a tax deficiency of approximately $6.7 million.   The Estate subsequently paid the tax, and the government then dismissed the case without prejudice while acknowledging the Estate's right to sue for a refund.[6]   Thereafter, the IRS denied the Estate's refund claim, and the Estate filed the instant suit seeking a refund of these tax payments in Counts I and II.

Count III of the Estate's Complaint concerns settlement payments the Estate made in connection with four civil lawsuits.   In 2002, both IAL and IALPR sued the Estate, seeking to set aside the sale of Batchelor's stock as a fraudulent transfer.   In addition, the Estate inherited two suits commenced prior to that sale, each stemming from Batchelor's involvement with Rich International Airways ("Rich").   The Estate eventually settled all four lawsuits, and made settlement payments totaling $41 million in July 2004.[7]   The Estate subsequently filed its Federal Estate Tax Return and deducted the settlement payments from Batchelor's gross estate as claims against the Estate pursuant to 26 U.S.C. § 2053(a)(3).   The

---

[6] To protect its interest in the probate estate, the government filed suit in *Batchelor III* before the IRS had issued a Notice of Deficiency to Batchelor or his Estate for Batchelor's 1999 and 2000 income tax returns.   After the IRS issued a Notice of Deficiency on April 29, 2005, the Estate chose to pay the tax and sue for a refund.

[7] In 2002, the Estate settled with the Rich plaintiffs for $2 million and $25 million.   The Estate settled with IALPR for $12 million in 2003, and with IAL for $1 million in 2004.

Estate later sought a refund of $8.3 million on its 2005 income tax return for those payments pursuant to 26 U.S.C. § 1341, which the IRS denied and the Estate now seeks to recover in Count III.

During the district court proceedings, the Estate filed a motion for summary judgment with respect to Count I on the basis of res judicata, arguing that both *Batchelor I* and its refund claim in Count I of this case involve the same cause of action. The government filed a cross-motion for summary judgment on Count III, arguing that the Estate should be precluded from taking both an income tax deduction and an estate tax deduction for the settlement payments. The district court granted both motions. With respect to the Estate's motion on Count I, the court found that res judicata barred the government's claim because the instant case and *Batchelor I* "arise out of the very same transaction" and because in both cases the government sought to establish that the value of the Option Assets transferred to Batchelor in 1999 had a higher value than Batchelor had reported. Regarding the government's motion on Count III, the court determined that because the Estate deducted the settlement payments from Batchelor's gross estate to reduce its estate tax obligations, the Estate could not also use those payments to reduce Batchelor's personal income tax liability. The case then proceeded to trial on Count II, which, like Count I, concerned the effect of the IAL stock sale on Batchelor's personal income taxes. As with Count I, the district court determined

6

that Count II arose from the sale of the Option Assets at issue in *Batchelor I*, and that res judicata precluded the government from contesting the Estate's refund claim.[8]  These cross-appeals followed.

## II.    Standards of Review

The district court's application of res judicata presents a question of law which we review *de novo*.  *In re Piper Aircraft Corp.*, 244 F.3d 1289, 1295 (11th Cir. 2001).  Likewise, the district court's interpretation of a statute – here, various provisions of the Tax Code – is also a question of law we review *de novo*.  *Comm'r v. Neal*, 557 F.3d 1262, 1269 (11th Cir. 2009).

## III.    Analysis

First, we address the district court's application of res judicata to Counts I and II.  Second, we address the Estate's attempt to claim an income tax deduction for the settlement payments at issue in Count III.

---

[8] Count I of the Estate's Complaint concerns Batchelor's 1999 income tax return.  Count II focuses on Batchelor's 2000 income taxes, and involves a proposed increase in Batchelor's capital gains by approximately $5.8 million.  On July 21, 2005, the Estate paid the additional tax allegedly owed on the proposed increase ($584,637), along with interest, and subsequently initiated the instant refund suit.  The government later conceded that Batchelor had in fact reported the $5.8 million at issue and that no additional tax was owed for 2000, but claimed the Estate was not entitled to a refund because the government should be permitted to offset Batchelor's 1999 tax deficiency by the excess amounts paid for 2000.  In its Order dated November 13, 2013, the district court found that the IRS had erroneously determined that Batchelor failed to report the $5.8 million at issue, and that the challenges the government made to this refund claim, including its attempt to offset its proposed recalculation of Batchelor's 1999 taxes, were barred by res judicata.  Our opinion addresses only the district court's application of res judicata.

## A.    Res Judicata

The district court determined that the government was precluded from defending against the Estate's claim that it had accurately reported the value of the Option Assets when calculating Batchelor's 1999 and 2000 income tax obligations. According to the district court, res judicata applies because both this suit and *Batchelor I* "arise out of the very same transaction" and "the government here is attempting to establish the exact same thing it sought to prove in Batchelor I: that the value of the option assets transferred to Batchelor in 1999 had a higher value than Batchelor and IALPR agreed upon." The district court also found that Batchelor's 1999 and 2000 income tax obligations could have been raised and decided in *Batchelor I*, such that those claims may not be raised here.

The government makes two primary arguments on appeal. First, it argues that res judicata does not apply because the personal income tax claims against Batchelor in this case and the transferee liability claim against IAL in *Batchelor I* are not the same cause of action. Second, the government argues that, even if the claims are part of the same cause of action, it could not have asserted the instant claims in *Batchelor I* given that the IRS had not yet issued a Notice of Deficiency with respect to the income tax claims against Batchelor at the time the complaint in *Batchelor I* was filed or when the time to amend the pleadings expired.[9]  *See Piper*

---

[9] On April 29, 2005, the IRS issued a Notice of Deficiency to the Estate for Batchelor's 1999 and 2000 income taxes, which was within the extended statute of limitations on assessment

8

*Aircraft Corp.*, 244 F.3d at 1296 (explaining that res judicata does not bar a claim that could not have been raised in the prior action).  In response, the Estate argues that both *Batchelor I* and the Estate's refund claims in Counts I and II arise out of the same transaction, *i.e.*, the sale of Batchelor's stock and subsequent transfer of the Option Assets, and that the value of the Option Assets is the critical factual issue in both cases.  The Estate also argues that the deficiency in Batchelor's 1999 and 2000 income taxes existed when Batchelor filed each return in 2000 and 2001, such that the government could have pursued a deficiency suit against him in *Batchelor I*, thereby satisfying this particular res judicata requirement.  Finally, the Estate argues that although the value of the Option Assets was not actually resolved in *Batchelor I*, the government should not be given a second bite at the apple with respect to that determination, particularly since it sought to employ the same expert witnesses and valuation reports across the two cases.  Because we find that *Batchelor I* and the instant suit are not the same cause of action, and therefore the instant suit is not barred, we need not address whether the government could have pursued its claims in *Batchelor I*, under a res judicata analysis, even though the IRS did not issue a Notice of Deficiency with respect to Batchelor's 1999 and 2000 tax returns until the period to amend the pleadings in *Batchelor I* had expired.

applicable in this case.  This is significant because the Tax Code's provisions relating to the assessment of deficiencies do not permit the government to bring suit to collect a tax deficiency until a Notice of Deficiency has been issued and the requisite 90-day period during which the taxpayer may file a petition in Tax Court has passed.  *See* 26 U.S.C. § 6213(a).

The primary dispute on appeal is whether the Estate's refund claims in Counts I and II are part of the same cause of action as the transferee liability claim in *Batchelor I*.   The party asserting res judicata bears the burden of showing that the later-filed suit is barred.  *In re Piper Aircraft*, 244 F.3d at 1296.  For a prior judgment to bar a subsequent action under the doctrine of res judicata, the following requirements must be met: (1) the prior judgment must have been a final judgment on the merits; (2) the prior judgment must have been rendered by a court of competent jurisdiction; (3) the parties, or those in privity with them, must be identical in both suits; and (4) the same cause of action must be involved in both cases.  *Ray v. Tenn. Valley Auth.*, 677 F.2d 818, 821 (11th Cir. 1982); *Ragsdale v. Rubbermaid, Inc.*, 193 F.3d 1235, 1238 (11th Cir. 1999).  We address only the last of these requirements.

When determining whether the causes of action are the same for purposes of res judicata, we consider "whether the primary right and duty are the same in each case." *Ragsdale*, 193 F.3d at 1239.  Although we have described the "rights and duties" test as the "principal" res judicata test, *id.*, we have stressed that courts must also consider the factual context of each case along with the "rights and duties" at issue.  *See Manning v. City of Auburn*, 953 F.2d 1355, 1359 (11th Cir. 1992) (explaining that it is an "oversimplification" to focus on rights and duties alone and that we must also compare the factual issues in each case).  In general,

10

even if the rights and duties at issue are distinct, where a case "arises out of the same nucleus of operative fact, or is based upon the same factual predicate," as a former action, the two cases constitute the same "claim" or "cause of action" for purposes of res judicata. *Ragsdale*, 193 F.3d at 1239.  When applying the "same nucleus of operative fact" test, we "look to the factual issues to be resolved [in the second lawsuit between the parties] and compare them with the issues explored in [the first lawsuit]." *Id*.  We apply a pragmatic approach to this analysis by comparing the substance of the actions, not their form. *See id.* at 1239 & 1239 n.8.

Applying these principles, we conclude that res judicata does not preclude the government from contesting the Estate's refund claims.  First, the instant case and *Batchelor I* do not share the same nucleus of operative fact.  The Estate's refund claims in Counts I and II pertain to Batchelor's personal income tax liabilities for 1999 and 2000.  Relevant to that determination are all facts that might impact Batchelor's income tax liability for those particular years, including whether he should have treated a portion of the income he received from the IAL stock sale as interest on the Note rather than as capital gain, a fact unrelated to Batchelor's potential liability for IAL's tax obligations as transferee.  In contrast, the government's claims in *Batchelor I* involve IAL's corporate income tax liability.  Facts impacting that issue include IAL's alleged use of a tax shelter scheme (in which Batchelor played no role), and IAL's solvency before and after

11

the transfer, neither of which impact the computation of Batchelor's own income tax obligations. Given the different tax liabilities at issue, the cases are factually distinct.

The Estate argues unconvincingly that both *Batchelor I* and the instant suit involve the same fundamental issue regarding the value of the Option Assets and the impact that valuation might have on its eventual tax liabilities, such that the cases share the same nucleus of operative fact. The Estate's focus is too narrow. Although it is true that both suits involve *a common factual issue*, *i.e.*, the value of the Option Assets, this is often the case in tax law, where an individual transaction may have multiple tax consequences. *See Towe v. Comm'r*, 64 T.C.M. 1424, 1992 WL 353773, at *3 (1992) (noting that "[a] single transaction or series of transactions can result in the incidence of both gift and income taxes"). Yet, what matters for res judicata purposes is not whether one common factual issue exists across two distinct tax liabilities, but whether the two suits constitute the same cause of action. Where, as here, the two suits involve different tax liabilities with a host of potential issues unique to each type of tax, the causes of action cannot be the same. Moreover, if we agreed with the Estate and ruled that the existence of one such common question across distinct tax liabilities precludes the future assessment of a tax liability that has not actually been litigated, our decision would potentially preclude the IRS, through an overly-broad interpretation of res judicata,

from collecting unpaid taxes for distinct tax liabilities linked only by a particular common transaction (from among potentially dozens of transactions in a given year's tax).    This would be an unworkable result, and would not square with the Tax Code's detailed statutory scheme on assessments.  *See Michael v. Comm'r*, 75 F.2d 966, 969 (2d Cir. 1935) (rejecting taxpayers' argument "that in one proceeding there must be determined the liability of the petitioner for his own taxes and his liability . . . for the taxes of all other taxpayers" because such a rule "would involve great difficulty in its administration and would practically render valueless the provision of the law which grants a longer period in which to assert the liability of a transferee of assets").[10]

We reach the same outcome under the rights and duties test.  Here, we find it significant that the instant case involves Batchelor's individual income tax liability under the statutory provisions governing personal income tax obligations, including 26 U.S.C. §§ 1, 6012, 6072, whereas *Batchelor I* was based on the corporate income tax liability imposed on IAL under statutes pertaining to that

---

[10] In a related argument, the Estate insists that the tax implications of specific completed transactions should be litigated only once.  The Estate's argument, however, rests on principles of issue preclusion rather than claim preclusion, and would be more persuasive had the value of the Option Assets actually been decided in *Batchelor I.  See Pleming v. Universal-Rundle Corp.*, 142 F.3d 1354, 1359-60 (11th Cir. 1998) (noting that for collateral estoppel to apply, the issue must have been actually litigated and determined in the prior proceeding); *Adolph Coors Co. v. Comm'r*, 519 F.2d 1280, 1283 (10th Cir. 1975) (stating that "[t]he doctrine of collateral estoppel is strictly applied in tax cases," and rejecting taxpayer's attempt to invoke the doctrine where the relevant issue had been raised, but not decided, in a previous case).

13

particular tax, including 26 U.S.C. § 11.  Thus, the two suits involve distinct tax obligations with a different set of rights and duties.[11]  Seeking to define the applicable "right" or "duty" more broadly, the Estate argues that the primary right at issue in both suits is the government's right to have the proper values reported and taxes paid on a particular transaction.  Although in some cases we have defined the applicable "right" or "duty" broadly, such as the right to continued employment, *Ray*, 677 F.2d at 821-22,[12] in other contexts we have focused more narrowly on specific statutory rights and duties to determine whether the cases are substantively distinct, *see, e.g., White v. World Fin. of Meridian, Inc.*, 653 F.2d 147, 150 (5th Cir. 1981);[13] *I.A. Durbin, Inc. v. Jefferson Nat'l Bank*, 793 F.2d 1541, 1549-50 (11th Cir. 1986).[14]  In the tax context, which is largely statutory, we

---

[11] Although the government sought to collect the unpaid tax directly from Batchelor in *Batchelor I*, his potential liability as transferee does not change the nature of the corporate tax liability at issue in *Batchelor I*.

[12] In *Ray*, we found that an employee's breach of contract claim arising from his termination was barred by res judicata due to an earlier suit alleging improper termination in violation of the employee's civil rights because in both suits "the primary right at issue was [plaintiff's] right of continued employment" and the breach of contract claim was substantively identical to the earlier civil rights claims.  *Ray*, 677 F.2d at 821-22.

[13] All decisions of the former Fifth Circuit issued before October 1, 1981, are binding precedent in this circuit.  *See Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981).

[14] In *White*, we rejected the res judicata defense because "[a]lthough the primary right and duty in both statutes . . . is identical in that they require [certain bank] disclosures, the nature and extent of those disclosures and the remedies afforded for nondisclosure are distinct" under the governing statutes, such that the "violations or wrongs" sued for under each statute were different.  *White*, 653 F.2d at 150.  In *I.A. Durbin*, we ruled that plaintiffs' contempt proceeding in bankruptcy court alleging wrongful seizure of personal property did not bar their subsequent civil rights suit alleging various constitutional claims based on the same seizure of property

14

believe the latter approach is best.  Accordingly, given that each type of tax at issue in this case is governed by substantively distinct provisions of the Tax Code, we find that the suits derive from different "rights and duties" within the meaning of our prior precedent, and thus do not constitute the same cause of action.

Although the decision in this case is grounded in Eleventh Circuit res judicata principles, our determination of whether *Batchelor I* and the instant suit involve the same "cause of action" is guided as well by cases applying res judicata in the tax context. The federal income tax is based on a system of annual accounting, rather than transactional accounting.  *See* 26 U.S.C. § 441.  For this reason, the United States Supreme Court in *Comm'r v. Sunnen*, 333 U.S. 591 (1948), recognized, in the context of a personal income tax dispute, that each tax year "is the origin of a new liability and of a separate cause of action."  *See id*. at 598.  According to *Sunnen*, "if a claim of liability . . . relating to a particular tax year is litigated, a judgment on the merits is res judicata as to any subsequent

---

because the primary right in the contempt proceeding was the statutory right "to prevent [defendants] from taking possession of the property after the filing of the bankruptcy petition," whereas the civil rights suit implicated the distinct "rights to be free from unreasonable searches and seizures and to due process in the taking of their property."  *I.A. Durbin*, 793 F.2d at 1549-50.  *See also Nash County Bd. of Educ. v. Biltmore Co.*, 640 F.2d 484, 487-88 (4th Cir. 1981) (stating that res judicata will apply "when the two statutes afford the same right or interdict the same wrong," and finding the defense applicable where "the state and federal statutes upon which the two actions are based are identical in language except in the requirement of the federal statute, but not of the state statute, of a showing of interstate commerce," particularly where the two suits involve the same wrongful act and operative facts).

proceeding involving the *same claim* and the *same tax year*." *Id.* (emphasis added). Consistent with *Sunnen*, this Court has recognized that a taxpayer's total tax liability for a particular type of tax and particular tax year constitutes a single cause of action. *See Finley v. United States*, 612 F.2d 166 (5th Cir. 1980). In *Finley*, we determined that "in federal tax litigation one's total income tax liability for each taxable year constitutes a single, unified cause of action, regardless of the variety of contested issues and points that may bear on the final computation," *id.* at 170, and thus there can only be one suit related to a taxpayer's tax liability for a particular year and particular tax (e.g., a taxpayer's year 2014 income tax liability). *See id.  See also United States v. Davenport*, 484 F.3d 321, 326 (5th Cir. 2007) (noting, for purposes of res judicata, that "the tax liability of a particular tax for a particular taxable year is a single cause of action") (internal marks omitted); *Michael v. Comm'r*, 75 F.2d 966, 969 (2d Cir. 1935) (recognizing that there can only be one suit to determine a taxpayer's individual tax liability for a particular year); *see also Estate of Hunt v. United States*, 309 F.2d 146, 147-49 (5th Cir. 1962) (affirming dismissal of taxpayer's suit for refund of estate taxes because a prior refund suit involving the same estate taxes was res judicata as to any additional issues that could have been raised with respect to the estate tax). For this reason, courts have long held that res judicata does not bar a subsequent tax suit unless the suit involves the same tax year and tax liability as a previous one.

16

*See S. Bancorporation, Inc. v. Comm'r*, 847 F.2d 131, 136 (4th Cir. 1988) ("In tax cases, res judicata is rare, since a prior income tax judgment could only bar a subsequent proceeding involving the same claim in the same tax year."); *S-K Liquidating Co. v. Comm'r*, 64 T.C. 713, 719 (1975) (finding that a prior suit involving the taxpayer's *withholding taxes* for calendar years 1968 and 1969 did not bar the IRS from pursuing a separate deficiency action for the taxpayer's *corporate income tax liability* for its fiscal year ending October 31, 1969, because "[t]he two taxes and the two taxable periods . . . are different"); *Smith v. United States*, 242 F.2d 486, 488 (5th Cir. 1957) (holding that res judicata does not apply to suits involving monthly excise taxes because "[e]ach month . . . is the origin of a new liability and of a separate cause of action").

It makes sense that res judicata would not apply to suits involving different tax years because the applicable laws and facts pertaining to distinct tax years are ever-changing. *See Sunnen*, 333 U.S. at 597-99. According to *Sunnen*, for suits involving different tax years, issue preclusion, which precludes litigation of only those issues actually determined in the initial suit, is the more appropriate defense, albeit one which should be used sparingly and with caution. *See id.* at 599-600; *see also Precision Air Parts*, 736 F.2d at 1501 (distinguishing res judicata and collateral estoppel); *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 327 n.5 (1979)

17

(same).[15] Thus, as one court has explained, "claim preclusion (res judicata) should give way to issue preclusion (collateral estoppel) where a different tax year is in question, *even if the legal issues and facts are otherwise the same*." *Burlington N. Santa Fe R. Co. v. Assiniboine and Sioux Tribes*, 323 F.3d 767, 771 (9th Cir. 2003) (emphasis added). *See also, e.g., Cooper v. United States*, 238 F.2d 40 (D.C. Cir. 1957) (finding taxpayer's income tax refund suit for 1946 through 1950 barred by res judicata for 1946 and by collateral estoppel for 1947 through 1950 where taxpayer had previously brought suit on his 1946 taxes and lost and same tax issue applied across all tax years); *Jonas v. Trapp*, 186 F.2d 951, 953-54 (10th Cir. 1950) (under the doctrine of collateral estoppel, taxpayer could not relitigate issue of whether he was a business partner with his wife for his 1941 income taxes when the court in a previous suit had rejected taxpayer's argument as it pertained to his 1940 income taxes).

Relevant to the instant suit, courts applying the principles of *Sunnen* have determined that res judicata does not apply to suits involving different types of tax liability, even when the suits involve the same underlying transaction, and, at least

---

[15] *Sunnen* explained,

> [I]f a claim of liability or non-liability relating to a particular tax year is litigated, a judgment on the merits is res judicata as to any subsequent proceeding involving the same claim and the same tax year. But if the later proceeding is concerned with a similar . . . claim relating to a different tax year, the prior judgment acts as a collateral estoppel only as to those matters in the second proceeding which were actually presented and determined in the first suit.

333 U.S. at 598-99.

in some respects, the same tax year. *Frank Sawyer Trust of May 1992 v. Comm'r*, 133 T.C. 60 (2009), is such a case. There, the party attempting to invoke res judicata, a trust, owned all of the stock in four corporations involved in the taxi business. *Id*. at 62. During the 2000 tax year, the corporations sold substantially all of their assets to unrelated third parties, recognizing substantial capital gains. *Id*. at 63. During the 2000 and 2001 tax year, the trust sold its stock in the corporations to a different third party. *See id*. at 63-65. The trust reported the sale of its stock on its income tax returns for tax years 2000 and 2001. Thereafter, the government sought to collect an alleged tax deficiency directly from the trust for unreported gain on the sale of its stock, arguing not only that the trust's basis in its stock was underreported, but also that the stock sale should be recharacterized to reflect the reality of the trust having sold the corporations' assets and having retained the sales proceeds for itself, without having paid any tax. *Id*. at 66-67. When the initial suit against the trust failed, the government then brought a separate action against the trust, as transferee of the corporations, seeking to collect the *corporations'* unpaid income tax attributable to the *corporations'* sale of assets.[16] *See id*. at 67-70.

Although both suits in *Frank Sawyer* implicated the sale of the corporate assets, the Tax Court found that res judicata did not bar the transferee liability

---

[16] The government was unable to collect against the corporations because they were insolvent at the time the additional taxes were assessed. *Frank Sawyer Trust*, 133 T.C. at 70.

action because the "cause of action" in each case was not the same. *See id.* at 76 & 72. According to the court, "[t]he deficiency cases [against the trust] dealt with the trust's gain on the sale of its stock," and had the government prevailed the trust would have been required to pay more tax on the sale of its stock. *Id.* at 76. The trust, however, would not have been required to pay the corporations' unpaid tax liabilities at issue in the transferee action, which arose from the corporations' attempts to artificially generate capital losses to offset their capital gains. *Id*. The court emphasized that in the first suit against the trust, the government had *not* attempted to collect the corporations' unpaid corporate tax. Accordingly, "[a]lthough the deficiency cases [against the trust for its own tax liabilities] and the instant action [against the trust as transferee] *arise out of similar facts*, there [wa]s no identity between the causes of action," and therefore res judicata did not apply. *Id.* at 78 (emphasis added).

The Tax Court applied this same reasoning nearly twenty years earlier in *Towe v. Comm'r*, 64 T.C.M. 1424, 1992 WL 353773 (1992), in which it determined that an income tax deficiency and a gift tax deficiency were separate causes of action for purposes of res judicata, even though each deficiency suit arose out of the same transaction and involved the same tax years. In *Towe*, the taxpayers argued that the IRS was precluded from making a gift tax determination concerning the same transaction and same taxable periods for which income tax

determinations had already been made and judicially resolved.  *See id.*  at *1-*2

(noting that "[t]he 1979-81 income tax determinations concerned the same

transactions (transfers of realty) as the gift tax and transferee determinations").

The taxpayers argued that "the [tax] treatment of the transfer of property was the

subject of earlier litigation and that there was an opportunity to litigate the issue"

in the earlier case.  *Id.* at *4.  Rejecting that argument, the court reasoned that "the

question of whether a particular transaction results in the incidence of gift tax is a

different issue or cause of action from whether it results in the incidence of income

tax."  *Id.* at *5.  Thus, the court concluded that "[t]he determination of one [tax

liability] does not preempt the determination of the other . . . even though both

determinations may concern the same transaction and/or taxable period."  *Id.*

Accordingly, the IRS was not precluded by res judicata from making the gift tax

determinations.  *Id.*

    *Frank Sawyer Trust* and *Towe* are distinguishable from those cases where

res judicata has been applied in transferee liability suits involving a dispute as to

*only one tax liability*, including, for example, *United States v. Davenport*, 484 F.3d

321 (5th Cir. 2007), and *Baptiste v. Comm'r*, 29 F.3d 1533 (11th Cir. 1994), on

which the Estate relies.  *Davenport* involved gifts of stock made by Birnie

Davenport, who passed away several years after making the gifts to her two

nephews and a niece without having paid the requisite gift tax.  In an initial suit to

21

determine the tax liabilities of Davenport's estate, the Tax Court found the estate liable for unpaid gift tax on Davenport's stock gifts. The Tax Court valued the stock at $2,000 per share, and calculated the tax deficiency owed by the estate based on that amount. *See Davenport*, 484 F.3d at 324. The estate later failed to pay the taxes owed. *Id*. The government then filed suit in federal district court against both the estate and the recipients of the stock gifts as transferees pursuant to 26 U.S.C. § 6324(b).[17] The Fifth Circuit found that the two suits involved the same operative facts and underlying transactions, as well as the same tax liability (i.e., the estate's gift tax liability), such that both cases involved the same cause of action. *See id*. at 327-28. Accordingly, the value of the stock, and the amount of gift tax due, could not be re-litigated. *Id*. at 329.

This Court considered a factually similar case in *Baptiste* and reached the same result. In that case, three brothers each received $50,000 as beneficiaries to their father's life insurance policy upon his death. *Baptiste*, 29 F.3d at 1535. After the decedent's estate filed an estate tax return, the IRS determined that the estate owed additional estate tax, which the estate contested in Tax Court. *Id*. The parties eventually stipulated to the amount of tax owed, and the court entered

---

[17] Title 26 of the United States Code section § 6324(b) provides an avenue by which the government may pursue a gift tax liability directly from the donee, who may be held personally liable for the unpaid gift tax. The statute provides, "If the [gift] tax is not paid when due, the donee of any gift shall be personally liable for such tax to the extent of the value of such gift." 26 U.S.C. § 6324(b). *See also Davenport*, 484 F.3d at 325 (describing section 6324(b) as a "transferee liability provision").

22

judgment in that amount. *Id*. at 1535-36. After the estate failed to pay the tax, the government attempted to collect from the Baptiste brothers as transferees pursuant to a statute that, like the gift tax statute at issue in *Davenport*, makes the recipient of the decedent's property personally liable for the estate tax. *See* 26 U.S.C. § 6324(a)(2). Applying res judicata, this Court held that Richard Baptiste, one of the Baptiste brothers who resided in Florida, was not permitted to relitigate the value of the property for purposes of calculating the amount of estate tax due. *See Baptiste*, 29 F.3d at 1539-41. We explained that "[t]he fact that [Richard Baptiste's] purpose is to decrease his personal liability, rather than in the interest of the estate, is of no moment. The estate's liability [for the estate tax] and Baptiste's liability [as transferee] both embrace the same determination – the amount of estate tax imposed by chapter 11."[18] *Id*. at 1539. *See also Egan's Estate v. Comm'r*, 260 F.2d 779, 780-85 (8th Cir. 1958) (holding res judicata barred transferee of corporation from relitigating transferor corporation's income tax liability for 1948 for purposes of determining transferee's liability for that particular tax).

As with *Frank Sawyer Trust* and *Towe*, and unlike *Davenport* and *Baptiste*, Counts I and II of the instant suit involve different tax liabilities and different underlying taxpayers than the claims at issue in *Batchelor I*. Therefore, the claims are not part of the same cause of action, even though they each involve the same

---

[18] Although *Baptiste* appears to be based on issue preclusion, it is still a useful comparison.

23

underlying transaction.[19]  For these reasons, we find that the district court erred in applying res judicata to bar the government's claims in Counts I and II and the decision must be reversed.

### B.    Settlement Payments

Count III of the Estate's Complaint concerns the $41 million in payments the Estate made in 2004 to settle various lawsuits against Batchelor.  In 2003, the Estate deducted the payments from Batchelor's gross estate as claims against the estate pursuant to 26 U.S.C. § 2053(a)(3).  The parties agree that this deduction was proper, and Batchelor's estate tax liability was not at issue before the district court.  However, after taking the estate tax deduction, the Estate also claimed an $8.3 million credit on its 2005 income tax return for the settlement payments.  The IRS denied the claim, and the Estate then filed the instant suit seeking a refund for the perceived overpayment pursuant to 26 U.S.C. § 1341.  The district court rejected the Estate's claim, finding that 26 U.S.C. § 642(g) barred the Estate from claiming both an estate tax deduction under § 2053 and an income tax deduction for the same payment.  We agree, and therefore affirm the district court's ruling.

The Estate's position is straightforward.  According to the Estate, 26 U.S.C. § 1341 entitles it to a return of the taxes Batchelor paid on the $41 million in IAL stock proceeds the Estate subsequently returned to IAL, IALPR, and the Rich

---

[19] The parties dispute whether the two cases involve the same tax year.  We need not resolve that issue, however, based on our determination that the underlying tax liabilities are distinct.

24

plaintiffs as settlement payments.  The Estate argues it is not seeking a tax windfall, but rather, because the $41 million at issue was originally reported as capital gain, by effectively returning that income, it should now be permitted a corresponding deduction or credit effectively consisting of a capital loss, and it insists § 1341 was designed to accomplish precisely that result.[20]  The government maintains that the Estate cannot use the $41 million repayment to reduce *both* its estate and income tax obligations, and instead may only deduct the payments from either one tax or the other.  We agree.

Section 1341 accounts for the fact that discrete financial transactions sometimes implicate multiple tax years.  In the ordinary case, deductions on a particular item of income are taken during the same year the income is earned and reported.  *See Mooney Aircraft, Inc. v. United States*, 420 F.2d 400, 402-03 (5th Cir. 1969).  It is not always possible, however, to match income and expenses in the same tax year, which may disadvantage the taxpayer due to changing circumstances across the two tax years.  *See id*. at 404-05; s*ee also Healy v. Comm'r*, 345 U.S. 278, 284 (1953) (noting that when a taxpayer restores an item of income in a later tax year, changes in income or fluctuations in tax rates between the year of receipt and the year of repayment could disadvantage the taxpayer).  In *North American Oil v. Burnett*, 286 U.S. 417 (1932), the United States Supreme

---

[20] The Estate calculated a refund of $8,322,466 under § 1341.

Court recognized that "[i]f a taxpayer receives earnings under a claim of right and without restriction as to its disposition, he has received income which he is required to [report], even though it may still be claimed that he is not entitled to retain the money, and even though he may still be adjudged liable to restore its equivalent." *Id*. at 424. This is known as the "claim of right" doctrine. Although the taxpayer in *North American Oil* was eventually entitled to keep the income, *id*. at 421, the Court explained that if the taxpayer, a corporation, "had been obliged to refund the [income] received in 1917, it would have been entitled to a deduction from the profits of 1922," the year the dispute regarding the income was resolved. *Id*. at 424. Although this was a hypothetical statement when made in *North American Oil*, the Supreme Court later faced this very scenario in *United States v. Lewis*, 340 U.S. 590 (1951). In that case, an employer gave his employee a $22,000 bonus in 1944, which the employee reported as income in 1944. *Id*. at 590. In 1946, a court determined that half of the bonus had to be returned to the employer. *Id*. The taxpayer returned the money, and then sought to amend his 1944 tax return to reduce his income for that year. *See id*. at 591. Consistent with what it had said previously in *North American Oil*, the Supreme Court rejected this approach, deciding instead that the proper solution would be to permit a deduction in the year of repayment, 1946, for the amount of tax that had been erroneously paid in 1944. *See id*. at 591-92. According to *Lewis*, the tax year in which the

26

contested amount was received could not be reopened, regardless of whether this would "result[] in an advantage or disadvantage to a taxpayer." *Id*. at 592.[21]

Congress later enacted 26 U.S.C. § 1341 to provide a statutory solution to the problem presented in cases like *Lewis* and to account for the tax disparities that may exist when a taxpayer claims a deduction in one year for an item of income received in an earlier year that the taxpayer was obliged to return. *See United States v. Skelly Oil Co.*, 394 U.S. 678, 680-81 (1969) ("Section 1341 of the 1954 Code was enacted to alleviate some of the inequities which Congress felt existed in this area"); *Maxwell v. United States*, 334 F.2d 181, 183 (5th Cir. 1964) ("[O]rdinarily amounts received under a claim of right must be included in taxable income in the taxable year of receipt, although repaid in a later year. Section 1341 was designed to alleviate the harsh effect of this rule"). Under 26 U.S.C. § 1341, "a taxpayer is entitled to relief if in one year the taxpayer included an item as gross income and paid tax on that income, then in a subsequent year is compelled to return the item." *Steffen v. United States*, 349 B.R. 734, 738 (M.D. Fla. 2006). The purpose of § 1341 is to "put the taxpayer in the same position he would have been in had he not included the item as gross income in the first place." *Fla. Progress Corp. v. Comm'r*, 348 F.3d 954, 957 (11th Cir. 2003). When § 1341 applies, the taxpayer is entitled to either a "deduction" or a tax "credit" in the year

---

[21] Justice Douglas dissented, noting that the decision might allow the government to exact tax on money that was not income to the taxpayer. *See Lewis*, 340 U.S. at 592 (Douglas, J., dissenting).

27

of repayment; the taxes due for the year the income was received are not affected. *See* 26 U.S.C. § 1341(a)(4) & (5).

> For § 1341 to apply, the taxpayer must show the following:
>
> (1)    an item was included in gross income for a prior taxable year (or years) because it appeared [at the time the income was received] that the taxpayer had an unrestricted right to such item;
>
> (2)    a deduction is allowable for the [current] taxable year because it was established after the close of such prior taxable year (or years) that the taxpayer did not have an unrestricted right to such item or to a portion of such item; and
>
> (3)    the amount of such deduction exceeds $3,000.

26 U.S.C. § 1341(a). In addition to these statutory requirements, a taxpayer must demonstrate a "substantive nexus between the right to the income at the time of receipt and the subsequent circumstances necessitating a refund." *Steffen*, 349 B.R. at 738. The taxpayer's return of the income must not be the result of the taxpayer's purely voluntary choice; rather, it must be "established," for example, by a court, that the taxpayer did not have an unrestricted right to the income. *See id*. at 739. The Tax Court has determined that payments made to settle a lawsuit may satisfy this requirement. *See Barrett v. Comm'r*, 96 T.C. 713 (1991).

When § 1341 applies, the taxpayer is required to pay the lesser of two computed tax payments in the year of repayment. *See* 26 U.S.C. § 1341(a) ("the tax imposed by this chapter for the taxable year *shall be* the lesser of" the two

28

computations) (emphasis added). Under the statute's first method of calculation, set forth in subsection (a)(4), the taxpayer simply computes the taxes owed in the year of repayment by *deducting* the restoration payment from his income in that year. 26 U.S.C. § 1341(a)(4). The second calculation method set forth in subsection (a)(5) is more complex, and results in a *credit* based on the taxes that would have been saved in the original year of receipt had the income never been received in that year.[22] *See id.* at § 1341(a)(5) & (b); *see also Fla. Progress*, 348 F.3d at 957 (explaining that the (a)(4) method of calculation results in a deduction from the current year's taxes, whereas the (a)(5) method permits the taxpayer to claim a tax credit for the amount his tax was increased in the prior year by including the item of income).

In *Fla. Progress*, this Court decided, based on the language of the statute and its corresponding regulations, that § 1341 does not, by itself, create an independent tax deduction and instead applies "only if another code section would provide a deduction for the item in the current year." 348 F.3d at 963. *See also id.* at 958-59 (rejecting the argument that "§ 1341 stands on its own" as a source of a

---

[22] Under 26 U.S.C. § 1341(a)(5), the taxpayer first computes his original, prior year tax with the restoration income included (as it was originally calculated in the year of receipt), then recomputes his tax for the prior year as if the item had not been included. The taxpayer then compares the two resulting tax obligations to determine the amount by which his tax would have been reduced had he not originally received the restored income. In the final step, the taxpayer reduces his current year's tax obligation by the amount his tax liability would have been reduced in the year of receipt under the re-computation.

deduction); *see also Alcoa, Inc. v. United States*, 509 F.3d 173, 178 n.4 (3d Cir. 2007) ("[I]t is a prerequisite for section 1341 treatment that the taxpayer be entitled to a deduction for all or part of the repaid amount under some other Code section.").[23] Thus, contrary to the Estate's argument, we cannot resolve the instant dispute simply by reference to § 1341.

To determine whether "another code section would provide a deduction for the item in the current year," *Fla. Progress*, 348 F.3d at 963, the district court found, and we agree, that the tax code provisions relating to overlapping estate and income tax deductions are relevant. In this context, 26 U.S.C. § 642(g), entitled "Disallowance of double deductions," generally prevents an estate from claiming both an estate tax deduction under 26 U.S.C. § 2053 and an income tax deduction for the same payment. The statute provides:

> Amounts allowable under section 2053 or 2054 as a deduction in computing the taxable estate of a decedent shall not be allowed as a deduction . . . in computing the taxable income of the estate or of any other person, unless there is filed . . . a statement that the amounts have not been allowed as deductions under section 2053 or 2054 and a

---

[23] In finding that § 1341 does not itself create an independent tax deduction, the Court reasoned:

> Subsection (a) of § 1341 provides that "*if*" three requirements are met, "*then*" the taxpayer is entitled to preferential treatment under [§ 1341]. 26 U.S.C. § 1341(a) (emphasis added). One of those requirements is that "a deduction" be "allowable for the taxable year because it was established after the close of such prior taxable year . . . that the taxpayer did not have an unrestricted right to such item. . . ." 26 U.S.C. § 1341(a)(2). The provision itself does not indicate whether a deduction should be allowable. That answer must be found in another provision of the code. . . . The regulations interpreting this provision confirm this conclusion.

*Fla. Progress*, 348 F.3d at 958-59 (emphasis in original).

30

waiver of the right to have such amounts allowed at any time as deductions under section 2053 or 2054.

26 U.S.C. § 642(g).  Section 642 contains an exception, however, for "income in respect of decedents."   *See id.* ("subsection [g] shall not apply with respect to deductions allowed under part II (relating to income in respect of decedents)"). Thus, a double deduction is permitted for "taxes, interest, business expenses, and other items accrued at the date of a decedent's death" that fall within § 2053(a)(3) as claims against the estate, as long as they are also allowable under § 691(b).  *See* 26 C.F.R. § 1.642(g)-2.  Section 691(b), in turn, provides that a decedent's estate may claim both deductions if the expense falls within one of six statutes:  sections 162, 163, 164, 212, 611, or 27.[24]  The district court in this case properly required the Estate to show that one of these statutes applied in order to claim both an estate tax deduction under § 2053 and an income tax deduction for the same payment.

The Estate argues on appeal, as it did in the district court, that sections 162 and 212 provide the basis for permitting the "double deduction" of the settlement payments at issue because the payments arise out of Batchelor's business activities

---

[24] Section 691(b) provides, in pertinent part:

> The amount of any deduction specified in section 162, 163, 164, 212, or 611 . . . or credit specified in section 27 . . ., in respect of a decedent which is not properly allowable to the decedent in respect of the taxable period in which falls the date of his death, or a prior period, shall be allowed . . . in the taxable year when paid . . . to the estate of the decedent.

in selling his IAL assets, and thus are ordinary and necessary business expenses.[25]

We disagree.  The $41 million at issue derives from income Batchelor originally reported as capital gain through the sale of his IAL stock.  Batchelor's treatment of this income as capital gain determines the character of a subsequent repayment of that income pursuant to *Kimbell v. United States*, 490 F.2d 203 (5th Cir. 1974), in which this Court determined that "a payment made by a taxpayer in satisfaction of a liability arising from an earlier transaction, on which that taxpayer reported capital gain [as here], must be treated as a capital loss at least to the amount of the capital gain," rather than as a § 162 business expense.  *Id.* at 205.  It is undisputed that Batchelor obtained the $41 million of income as a result of his sale of IAL stock.  It is also undisputed that the settlement payments were made to resolve claims that Batchelor had received excess consideration in selling his interest in IAL, such that the Estate's repayments are sufficiently linked to Batchelor's original receipt of income.[26]  Accordingly, *Kimbell* does not permit the Estate to

---

[25] 26 U.S.C. § 162(a) provides, "There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business."  26 U.S.C. § 212 similarly provides, "In the case of an individual, there shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year . . . (1) for the production or collection of income."  Although the provisions are similar, unlike § 162(a), § 212 lacks a "trade or business" requirement. *See Estate of Yaeger*, 889 F.2d 29, 33 (2d Cir. 1989).

[26] The Estate concedes that if IAL was rendered insolvent by the stock sale and Batchelor received excess consideration, he was liable to return it to IAL or its creditors, including the plaintiffs in the four unrelated suits against Batchelor.  Thus, we find that the amounts paid in settlement of those suits are sufficiently linked to the initial income so as to trigger *Kimbell*.

32

claim a deduction under § 162, and the Estate thus fails to satisfy § 691(b) by way of § 162.

The Estate also attempts to satisfy § 691(b) by invoking § 212, which, in pertinent part, permits a deduction to "an individual" for "ordinary and necessary expenses paid or incurred during the taxable year . . . for the production or collection of income."  26 U.S.C. § 212(1).  In this Circuit, however, "§ 162(a) and 212 are . . . considered *in pari materia*;" thus, "the restrictions and qualifications applicable to the deductibility of trade or business expenses [under § 162] are also applicable to expenses covered by section 212."  *Sorrell v. Comm'r*, 882 F.2d 484, 487 (11th Cir. 1989) (quoting *Fishman v. Comm'r*, 837 F.2d 309, 311 (7th Cir. 1988), *cert. denied*, 487 U.S. 1235 (1988))*; Estate of Meade v. Comm'r*, 489 F.2d 161, 164 n.6 (5th Cir. 1974) ("For purposes of this distinction between capital expenses and ordinary expenses, sections 162 and 212 are construed in the same manner . . . .").  Moreover, the rationale of *Kimbell* – that a taxpayer who initially reported income as capital gain may not receive the tax windfall that would result by recharacterizing a related expense as an ordinary business expense – applies with equal force to § 212.[27]  *See Estate of Meade*, 489 F.2d at 163-66 (taxpayers who received settlement payments in a lawsuit and reported those proceeds as

---

[27] The parties dispute whether Batchelor's liability accrued before his death.  Having determined that the Estate's proffered income tax deduction is not allowable under section 691(b), we need not address this argument.

capital gain were not permitted to deduct their legal fees associated with the suit as payments for the production of income under § 212). Thus, the Estate's attempt to invoke § 212 also fails.

In an attempt to circumvent the statutes, the Estate insists it should be allowed a double deduction because otherwise the government will receive a windfall from the income taxes Batchelor paid on the $41 million at issue. In effect, the Estate urges us to fashion an equitable result; however, doing so would require us to either disregard § 642(g), or to construe § 691(b) as though it also included § 1341 as an exception, neither of which we can do. The double deduction the Estate seeks is plainly prohibited by 26 U.S.C. § 642(g), *see Estate of Luehrmann v. Comm'r*, 287 F.2d 10, 12-13 (8th Cir. 1961) (recognizing that the purpose of § 642(g)'s predecessor statute "was to prevent taxpayers claiming the same items of administration expenses as deductions for both estate income tax and estate tax purposes"), and § 1341 is not one of the enumerated exceptions in § 691(b). Accordingly, we do not believe Congress intended to allow a double deduction based solely upon the potential application of § 1341. *See Andrus v. Glover Constr. Co.*, 446 U.S. 608, 616-17 (1980) ("Where Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent."). *See also CBS Inc. v. Prime Time 24 Joint Venture*, 245 F.3d 1217, 1226 (11th Cir.

34

2001) ("'[W]here Congress knows how to say something but chooses not to, its silence is controlling.'") (quoting *In re Griffith*, 206 F.3d 1389, 1394 (11th Cir. 2000) (en banc)); *Harris v. Garner*, 216 F.3d 970, 976 (11th Cir. 2000) ("[T]he role of the judicial branch is to apply statutory language, not to rewrite it."). Thus, even assuming the equities actually favor the Estate, such concerns cannot trump the applicable statutes.  *See Long v. Comm'r*, 772 F.3d 670, 678 (11th Cir. 2014) ("[D]eductions under the Internal Revenue Code are a matter of legislative grace and the taxpayer who claims the benefit must . . . 'clearly establish' his entitlement to a particular deduction.") (internal marks and citations omitted); *Estate of Luehrmann*, 287 F.2d at 15 ("Tax exemptions and deductions do not turn upon general equitable considerations but depend upon legislative grace.  Statutes authorizing tax exemptions and deductions are to be strictly and narrowly construed."); *Culley v. United States*, 222 F.3d 1331, 1334 (Fed. Cir. 2000) ("It is basic tax law that deductions from taxable income, for purposes of computing tax due the United States, are matters of statutory grant").

Finally, the Estate points to three authorities as grounds for invoking § 1341 without reference to either 642(g) or 691(b):  Revenue Ruling 77-322, which permits "[a]n estate [to] utilize . . . section 1341 . . . in computing its tax when it restores an item that was previously included in income by the decedent under a claim of right;" *Estate of Good v. United States*, 208 F.Supp. 521 (E.D. Mich.

35

1962), in which the court determined that an estate was entitled to use § 1341 to obtain a refund of the income taxes a decedent had paid on income that the decedent's employer later determined had been erroneously paid even though the estate also took an estate tax deduction for the repayment; and *Nalty v. United States*, No. 73-1574-B, 1975 WL 577 (E.D. La. Apr. 16, 1975), which followed *Estate of Good*.

Aside from the fact that these authorities are not binding, *see Redwing Carriers, Inc. v. Tomlinson*, 399 F.2d 652, 657 (5th Cir. 1968) (noting that Revenue Rulings are merely persuasive), we disagree with their rationale. First, *Estate of Good*, *Nalty*, and Revenue Ruling 77-322 do not account for this Circuit's requirement that a deduction must be allowable under another provision of the Tax Code for § 1341 to apply. *See Fla. Progress*, 348 F.3d at 958-59. Thus, it is not enough to merely conclude that the requirements of § 1341(a)(1)-(3) are met when the facts of the case implicate § 642(g). Second, although the Estate's authorities purport to distinguish between the "credit" offered by subsection (a)(5) and the "deduction" offered by subsection (a)(4), *see Estate of Good*, 208 F.Supp. at 523; *Nalty*, 1975 WL 577, at *5 (relying on the same distinction); Rev. Rul. 77-322 (adopting *Estate of Good* without supporting explanation), we do not believe § 642(g)'s prohibition on double deductions would give way to § 1341 regardless of whether the Estate claimed a credit or a deduction. The deduction/credit

36

distinction merely determines how to account for a § 1341 repayment on one's return, nothing more.   What matters is not whether a taxpayer may use § 1341 to reduce his present year taxes through a tax credit or a deduction, but rather whether a reduction in his income taxes is permitted at all (along with a corresponding estate tax deduction).  In addition, whether a particular application of § 1341 would result in more favorable treatment to a taxpayer under subsection (a)(4) or (a)(5) depends on the fortuities of a given case, including changing tax rates and tax brackets between the year of receipt and the year of repayment.  *See Missouri Pac. R.R. Co. v. United States*, 423 F.2d 727, 729-35 (Ct. Cl. 1970) (discussing the legislative history of § 1341 and its alternative methods of calculation in a case where the taxpayer's tax rates varied widely over the tax years in question); *cf. Skelly Oil Co.*, 394 U.S. at 681 (noting that, under the claim of right doctrine, "the tax benefit from the deduction in the year of repayment might differ from the increase in taxes attributable to the receipt; for example, tax rates might have changed, or the taxpayer might be in a different tax 'bracket.'").  We do not believe Congress intended the availability of a double deduction under § 642(g) to turn on such fortuities.  Regardless of whether a taxpayer would be entitled to a "deduction" under subsection (a)(4) or a "credit" under subsection (a)(5), section 642(g) and its accompanying regulations make clear that § 1341 alone does not determine whether a taxpayer may reduce both his income and estate tax liabilities

37

for the same outlay without consideration of § 691(b). Thus, we reject the underlying rationale of the Estate's authorities. Since the Estate has failed to identify an applicable deduction identified in § 691(b), we find no error in the district court's determination that the Estate cannot avoid § 642(g)'s bar on double deductions, and therefore affirm on Count III.

Accordingly, we reverse the district court's judgment in favor of the Estate on Counts I and II and affirm the judgment in favor of the government on Count III.

**AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.**