# United States Court of Appeals
## For the First Circuit

No. 15-2540

ROBB EVANS & ASSOCIATES, LLC, AS RECEIVER, ETC.,

Plaintiff, Appellee,

v.

UNITED STATES OF AMERICA,

Defendant, Appellant.

No. 15-2552

ROBB EVANS & ASSOCIATES, LLC, AS RECEIVER, ETC.,

Plaintiff, Appellant,

v.

UNITED STATES OF AMERICA,

Defendant, Appellee.

APPEALS FROM THE UNIED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
[Hon. Michael A. Ponsor, U.S. District Judge]
[Hon. Kenneth P. Neiman, U.S. Magistrate Judge]

Before

Lynch, Circuit Judge,
Souter, Associate Justice,*
and Selya, Circuit Judge.

---

* Hon. David H. Souter, Associate Justice (Ret.) of the Supreme
Court of the United States, sitting by designation.

Paul A. Allulis, Attorney, Tax Division, United States Department of Justice, with whom Caroline D. Ciraolo, Principal Deputy Assistant Attorney General, Tax Division, United States Department of Justice, Teresa E. McLaughlin and Gilbert S. Rothenberg, Attorneys, Tax Division, and Carmen M. Ortiz, United States Attorney, were on brief, for the United States.

David J. Vendler, with whom Morris Polich & Purdy LLP, Gregory S. Duncan, Stephen G. Hennessy, Joseph S. Tusa, and Tusa P.C. were on brief, for Robb Evans & Associates, LLC.

March 3, 2017

**SELYA**, **Circuit Judge**.    These appeals require us to construe and apply 26 U.S.C. § 1341(a), reproduced in the Appendix, a statutory provision that addresses the situation of a taxpayer who pays taxes on income that she must later restore because it is established in a subsequent year that she did not have an unrestricted right to the income.    The statute permits such a taxpayer to reduce her tax liability for the year of repayment by the amount that her taxes in the year of inclusion would have decreased had the restored funds been excluded from her income in that year.    But there is a catch: by its terms, section 1341(a) requires that the taxpayer must have had what appeared to be an unrestricted right to the income when she first reported it.

Here, the controversy over the meaning and application of section 1341(a) arises in the course of a tax-refund suit brought by a court-appointed receiver.    The court below, noting that Congress had enacted section 1341 in a spirit of fairness, fashioned a judicially created exception to the statute's "unrestricted right" requirement.    Applying that judicially created exception, the court proceeded to deny the government's motion to dismiss and granted a modicum of relief.[1]    Both sides

_____

[1] The district court initially referred the government's motion to dismiss to a magistrate judge. See Fed. R. Civ. P. 72(b).    The district court, exercising de novo review, see id., later adopted the recommendation, adding its own gloss.    For ease in exposition, we take an institutional view and refer to the determinations below as those of the district court.

- 3 -

appeal. After careful consideration of these appeals, we conclude that the district court erred: that Congress, in the spirit of fairness, tailored a statute to iron out a wrinkle in the Internal Revenue Code does not give a court license to make the application of the statute wrinkle-free. This conclusion leads us to apply the luminously clear language of the statute as written, sustain the government's appeal, reject the cross-appeal, reverse the judgment below, and remand for entry of judgment dismissing the tax-refund suit.

## I.  BACKGROUND

This tax-refund suit has its genesis in the efforts of Robb Evans & Associates, LLC, a court-appointed receiver (the Receiver), acting on behalf of a class of defrauded persons (the underlying plaintiffs), to collect judgments previously rendered against a network of interlocking corporations and their proprietors, John and Richard Puccio. The twists and turns of the Puccios' fraudulent scheme are by now well-documented. See, e.g., Zimmerman v. Epstein Becker & Green, P.C. (Zimmerman V), 657 F.3d 80 (1st Cir. 2011); Zimmerman v. Puccio (Zimmerman IV), 613 F.3d 60 (1st Cir. 2010); Zimmerman v. Cambridge Credit Counseling Corp. (Zimmerman II), 409 F.3d 473 (1st Cir. 2005). We assume the reader's familiarity with these opinions and with the district court's exegetic accounts of the facts undergirding the class action litigation. See Zimmerman v. Cambridge Credit Counseling

Corp. (Zimmerman III) 529 F. Supp. 2d 254, 256-64 (D. Mass. 2008); Zimmerman v. Cambridge Credit Counseling Corp. (Zimmerman I), 322 F. Supp. 2d 95, 96-98 (D. Mass. 2004).[2] Consequently, we rehearse here only those skeletal facts needed to put these appeals into workable perspective.

In 1996, the Puccio brothers formed Cambridge Credit Counseling Corporation (CCCC), a non-profit corporation organized under Massachusetts law. At around the same time, they formed parallel non-profit corporations in Florida and New York. These other corporations operated in much the same way as CCCC and, for simplicity's sake, we refer to the three non-profits, collectively, as CCCC.

CCCC held itself out as skilled in improving credit ratings and trumpeted its ability to help financially strapped individuals by creating "debt management plans" for a fee. Under such a plan, an individual in straitened circumstances would make a single monthly payment to CCCC, and CCCC would (at least in theory) sprinkle payments around to the individual's creditors. As part of its service, CCCC aspired to "re-age" clients' debt, that is, to persuade creditors to mark clients' accounts as current

---

[2] For the sake of completeness, we note that the decision in Zimmerman III was affirmed by this court in Zimmerman IV, and the decision in Zimmerman I was reversed by this court in Zimmerman II. Neither of these appellate decisions calls into question the district court's factual accounts.

- 5 -

in exchange for promises that CCCC would make regular payments. Business boomed: from 1996 to 2004, CCCC harvested over $250,000,000 from hopeful clients.

The Puccio brothers likewise owned and controlled an array of for-profit businesses, some of which provided back-office support to the non-profit entities. The assets and operations of these businesses were inextricably intertwined with those of the non-profit entities: all of them shared management, staff, office space, clients, and funds. For example, CCCC freely transferred clients' accounts to its for-profit brethren without bothering to notify the affected clients.

The balloon went up in 2003, when the underlying plaintiffs brought a class action against the Puccios and several of their corporations (both for-profit and non-profit). Roughly five years later, the district court granted summary judgment in favor of the underlying plaintiffs on their state-law consumer protection claims, Mass. Gen. Laws ch. 93A, and their claims under the federal Credit Repair Organizations Act (CROA), 15 U.S.C. § 1679 et seq. Judgment was entered against the corporations in the amount of $259,085,983 and against the Puccios in the amount of $256,527,000. The Puccios unsuccessfully appealed. See Zimmerman IV, 613 F.3d at 69, 76.

Securing a judgment and realizing the fruits of that judgment are two different things. Thus, the district court

appointed the Receiver and tasked it with collecting the judgments on behalf of the underlying plaintiffs.  For the most part, though, the money had vanished into thin air: the Receiver was able to recoup less than $2,500,000.[3]  Endeavoring to boost this total, the Receiver filed a tax-refund claim for $9,387,235.  The essence of the Receiver's claim follows.

- The Receiver can assert a refund claim on behalf of certain taxpayers, namely, the Puccios and their for-profit corporations, which were judgment debtors.

- In earlier years, those taxpayers reported as income, and paid taxes on, monies that they euchred from the underlying plaintiffs.

- By virtue of the class-action judgment, the taxpayers are now obligated to restore those monies to the underlying plaintiffs (through the Receiver).

- The taxpayers may deduct those repayments, see 26 U.S.C. § 162, and may reduce their tax liability for the year of

_____

[3] Pursuant to the district court's order of appointment, these proceeds were deposited into what the court denominated as a Qualified Settlement Fund.  See Rob Evans & Assocs., LLC v. United States, 9 F. Supp. 3d 165, 167 (D. Mass. 2014) (explaining that the Fund will "hold the monetary assets of the receivership as . . . acquired"); see also 26 C.F.R. § 1.468B-1 (defining "qualified settlement fund").  Relatedly, we note that the district court, in the rescript that embodied this order, misspelled the Receiver's name (dropping a "b" from "Robb").  That bevue does not affect the substance of the court's order.

- 7 -

repayment by the amount that they overpaid in the years that they originally reported the income, see id. § 1341(a).

• Because the amounts of these deductions will exceed the taxpayers' tax liability for the year of repayment, refunds will be in order — and those refunds should be paid to the Receiver.

In June of 2011, the Internal Revenue Service (IRS) denied the tax-refund claim. The Receiver responded by bringing this suit. See 28 U.S.C. § 1346(a)(1). The government moved to dismiss, arguing among other things that the Receiver (who stands in the taxpayers' shoes) was not entitled to the benefit of section 1341(a) because it never appeared to the taxpayers that they had an unrestricted right to the funds fraudulently obtained from the underlying plaintiffs. The district court denied the government's motion to dismiss. Although it agreed that the taxpayers never appeared to have an unrestricted right to the funds reported as income, it nonetheless concluded that, as a matter of equity, "the fraudulent conduct of the Puccios should not be imputed to [the Receiver]." Rob Evans & Assocs., LLC v. United States, 9 F. Supp. 3d. 165, 169 (D. Mass. 2014). Accordingly, the court denied the government's motion to dismiss, holding that the government was obligated to honor the refund request. See id. at 171.

The Receiver, though, did not achieve a total victory. The court limited the amount of the refund by holding that it must

be based on the amount the receiver had actually collected and deposited into the Qualified Settlement Fund, not on the full amount of taxes paid by the taxpayers during the relevant years. See id. at 170-71; see also note 3, supra.

After deciding the motion to dismiss, the district court stayed the case so that the Receiver could file administrative refund claims for additional tax years. The IRS denied those claims, and the Receiver, in its own words, filed its first amended complaint in order to "include [claims for] additional tax years." At that point, however, the Receiver gratuitously added two other sets of allegations in the first amended complaint: a constructive trust argument and a claim that section 1341(a) did not require actual restoration of the funds to the Qualified Settlement Fund as a condition precedent to deductibility. The government filed an answer and, since the district court's earlier adjudication of the motion to dismiss had effectively resolved the essence of the dispute, the parties jointly moved for the entry of final judgment, reserving their rights to appeal. The court granted the joint motion without substantive comment, relying on the reasoning laid out in its prior decision on the motion to dismiss. These timely appeals followed.

## II. ANALYSIS

In this venue, the government's principal argument is that the district court erred in allowing the Receiver access to

the balm of section 1341(a) because the taxpayers never appeared to have an unrestricted right to the reported income. In opposition, the Receiver starts by questioning our appellate jurisdiction. Past that point, the Receiver asserts that the taxpayers did have an apparent unrestricted right to the reported income and, in all events, that the district court did not err in fashioning an equitable exception to the statutory "unrestricted right" requirement. Finally, the Receiver submits that it is entitled to recoup all taxes paid to the government under a constructive trust theory. Before proceeding to more substantive matters, we briefly address the Receiver's jurisdictional challenge.

## A. **Appellate Jurisdiction**.

The Receiver's jurisdictional challenge is premised on the contention that we lack jurisdiction because the government, despite reserving its right to appeal in the consent judgment, did not adequately manifest an intent to appeal. This challenge lacks force.

It is common ground that a party may preserve its right to appeal a consent judgment by "reserv[ing] that right unequivocally." BIW Deceived v. Local S6, Indus. Union of Marine & Shipbldg. Workers of Am., 132 F.3d 824, 828 (1st Cir. 1997) (quoting Coughlin v. Regan, 768 F.2d 468, 470 (1st Cir. 1985)). Here, the joint motion for entry of final judgment unequivocally

- 10 -

reserved the parties' rights to appeal. To begin, the parties —
according to the motion itself — "move[d] the Court . . . to enter
a final, appealable judgment." Moreover, the motion made pellucid
that the parties "reserve[d] their rights to appeal any of the
Court's rulings, findings or orders." Erasing any vestige of
doubt, the motion later reiterated that the parties "reserve[d]
their rights to challenge on appeal the Court's legal and factual
findings."

Although this language seems clear as a bell, the
Receiver suggests that something more was exigible. In the
Receiver's view, a specific statement of the government's
intention to appeal was essential. To support this view, the
Receiver notes that some of the case law refers to an intent to
appeal. See, e.g., Scanlon v. M.V. Super Servant 3, 429 F.3d 6,
10 (1st Cir. 2005). That language, though, does not set up a
separate requirement: it merely confirms that statements of an
intent to appeal can in some circumstances supply evidence of a
reservation of a right to appeal. See BIW Deceived, 132 F.3d at
828. All that is needed to pave the way for appellate
jurisdiction, however, is the clear reservation of a right to
appeal, followed by the timely filing of a notice of appeal. See
Fed. R. App. P. 4(a)(1); BIW Deceived, 132 F.3d at 828. Because
that sequence of events occurred in this case, we have jurisdiction
to hear and determine the government's appeal.

## B.  **The Government's Appeal.**

The government's appeal challenges head-on the viability of the Receiver's tax-refund claim.  Before addressing this challenge, some stage-setting is useful.

A taxpayer must include all of her gross income in her taxable income each year.  See N. Am. Oil Consol. v. Burnet, 286 U.S. 417, 424 (1932).  This obligation extends even to income obtained unlawfully.  See James v. United States, 366 U.S. 213, 219 (1961) (plurality opinion).  At a later date, though, it may become evident that the taxpayer did not have a right to items previously included in her gross income.  If the taxpayer restores such an item of income to its lawful owner, she may be able to deduct that repayment in the current year.  See, e.g., 26 U.S.C. §§ 162, 165.  But because the taxpayer's situation may have changed (say, her annual income may have decreased or her tax bracket may have been lowered), it may disadvantage her to take the deduction in the year of repayment.  See United States v. Skelly Oil Co., 394 U.S. 678, 681 (1969).

To guard against any such inequity, Congress enacted 26 U.S.C. § 1341.  This statute does not itself provide for a deduction but, rather, applies only if a deduction is available under some other provision of the Internal Revenue Code.  See Fla. Progress Corp. & Subsids. v. Comm'r, 348 F.3d 954, 958 (11th Cir. 2003) (per curiam).  In that event, section 1341(a) allows a

taxpayer to choose between two different ways of calculating her otherwise available deduction for the restored funds.  Under the first option, the taxpayer may simply deduct the amount of the restored funds in the year of repayment.  See 26 U.S.C. § 1341(a)(4).  Under the second option, the taxpayer may calculate her taxes for the year of repayment without deducting the amount of the restored funds and then reduce that tax liability "by the amount [her] taxes were increased in the year or years of receipt because the disputed items were included in gross income."  Skelly Oil, 394 U.S. at 682; see 26 U.S.C. § 1341(a)(5).  It is this latter method, which more or less puts the taxpayer in the position that she would have occupied had she never reported the income, that the Receiver wishes to employ.

For section 1341(a)(5) to apply, a taxpayer must satisfy three prerequisites.  She must show that:

(1) an item was included in gross income for a prior taxable year (or years) because it appeared that the taxpayer had an unrestricted right to such item;

(2) a deduction is allowable for the taxable year because it was established after the close of such prior taxable year (or years) that the taxpayer did not have an unrestricted right to such item or to a portion of such item; and

(3) the amount of such deduction exceeds $3,000.

26 U.S.C. § 1341(a)(1)-(3).  Here, the government does not gainsay that the taxpayers included the funds at issue in income for prior years; that, if the funds are restored, a deduction will be

- 13 -

available; and that the deduction, whatever its precise amount, exceeds $3,000. The Receiver's claim is derivative of the taxpayers' rights. For present purposes, then, the dispositive issue reduces to whether, at the time the income was reported, it appeared to the taxpayers that they had an unrestricted right to the funds. As we explain below, if the funds were derived from fraudulent activity, it could not have appeared to the taxpayers that they had an unrestricted right to them.

The district court (despite its eventual ruling in favor of the Receiver) thought not. It held that the Receiver was collaterally estopped from advancing such an argument because the funds were derived from fraudulent activity: the taxpayers "were found . . . to have committed fraud" and, therefore, could not have had (or appeared to have had) an unrestricted right to the funds. Rob Evans, 9 F. Supp. 3d at 169 & n.5. Our review of the Receiver's challenge to the district court's application of the collateral estoppel doctrine is de novo. See Faigin v. Kelly, 184 F.3d 67, 78 (1st Cir. 1999).

Collateral estoppel, sometimes called issue preclusion, bars parties from re-litigating issues of either fact or law that were adjudicated in an earlier proceeding. See Manganella v. Evanston Ins. Co., 700 F.3d 585, 591 (1st Cir. 2012); Kale v. Combined Ins. Co., 924 F.2d 1161, 1168 (1st Cir. 1991). Here, the district court regarded certain determinations made in the federal

class action suit as preclusive.  In the absence of any objection, we follow the usual rule that "[t]he preclusive effect of a federal-court judgment is determined by federal common law." Taylor v. Sturgell, 553 U.S. 880, 891 (2008).

Under federal common law, there are four prerequisites to the application of collateral estoppel.  The party seeking preclusion must show that "(1) both proceedings involve[] the same issue of law or fact, (2) the parties actually litigated that issue [in the prior proceeding], (3) the prior court decided that issue in a final judgment, and (4) resolution of that issue was essential to judgment on the merits."  Global NAPs, Inc. v. Verizon New Eng. Inc., 603 F.3d 71, 95 (1st Cir. 2010).  We employ this framework to determine whether the Receiver is collaterally estopped from asserting that the taxpayers could have believed that they had an unrestricted right to the funds at issue.

In this case, our inquiry is considerably shortened: the Receiver does not contest that the prior proceeding (the federal class action) satisfies the second, third, and fourth prerequisites for collateral estoppel.  The critical factor is whether both proceedings involve the same issue. This factor turns on whether the district court's earlier finding of fraud effectively resolved the question of whether the taxpayers had an apparent unrestricted right to the income reported on their tax returns.

- 15 -

The "unrestricted right" question cannot be answered in a vacuum but, rather, must be answered in light of section 1341(a). According to Treasury Department regulations, section 1341(a) covers "an item included in gross income because it appeared from all the facts available in the year of inclusion that the taxpayer had an unrestricted right to such item." 26 C.F.R. § 1.1341-1(a)(2).[4] The law is clear, though, that it cannot be said to appear to an embezzler or fraudster that he has an unrestricted right to his ill-gotten gains (notwithstanding the fact that he is obligated to report those gains in his annual gross income). See Culley v. United States, 222 F.3d 1331, 1335-36 (Fed. Cir. 2000); Kraft v. United States, 991 F.2d 292, 299 (6th Cir. 1993); McKinney v. United States, 574 F.2d 1240, 1243 (5th Cir. 1978). In short, section 1341(a)'s "unrestricted right" language excludes all income reaped by taxpayers who know at the time of receipt that they have no right to the income. "When a taxpayer knowingly obtains funds as the result of fraudulent action, it simply cannot appear from the facts known to him at the time that he has a legitimate, unrestricted claim to the money." Culley, 222 F.3d at 1335. It follows inexorably that if the taxpayers acquired the

_____

[4] This requirement should not be confused with the "claim of right" doctrine, which is broader and includes virtually everything that a taxpayer must report in her annual gross income. See Culley v. United States, 222 F.3d 1331, 1336 (Fed. Cir. 2000) (distinguishing claim of right doctrine from section 1341(a)'s "unrestricted right" requirement).

funds at issue by fraud, they could not have thought that they had an unrestricted right to those funds.

That ends this aspect of the matter. The district court squarely decided, in the earlier class action, that the taxpayers were swindlers who had obtained the underlying plaintiffs' funds by fraud. In this regard, the district court held that the taxpayers' "representation[s] that CCCC was a nonprofit entity" were "material," and that the taxpayers "betrayed Plaintiffs' trust when, as was [their] policy for all CCCC clients, [they] transferred Plaintiffs' accounts to [their for-profit businesses]." Zimmerman III, 529 F. Supp. 2d at 279. The court considered this more than adequate to show that the taxpayers were engaged in fraud. See id. at 280. In a separate order, the court added frosting to the cake: it found that the Puccio brothers' noncompliance with CROA "involved false pretenses, the use of false representations[,] and amounted to actual fraud." Zimmerman v. Cambridge Credit Corp., No. 03-30261, slip op. at 1-2 (D. Mass. Mar. 18, 2009). The brothers, through their network of corporations, had "engaged in a pervasively deceptive course of business involving fraudulent misrepresentations to consumers." Id. at 5-6.

This finding of pervasive fraud was affirmed on appeal, see Zimmerman IV, 613 F.3d at 62, and the class action judgments against the taxpayers have become final. Thus, the Receiver is

collaterally estopped from challenging the finding. And because it has been conclusively determined that the taxpayers procured the funds at issue through fraud, the taxpayers could not have thought that they had an unrestricted right to the funds. See Culley, 222 F.3d at 1335. Consequently, the Receiver, standing in their place and stead, is collaterally estopped from asserting that the taxpayers satisfied the requirements of section 1341(a).[5]

The Receiver offers virtually nothing in the way of developed argumentation against the application of collateral estoppel. The Receiver does, however, make two points. First, it laments that the government "was in large part responsible for providing the [taxpayers] with the[] legal cover" that enabled them to execute their fraudulent scheme. This boils down to a suggestion that the government should be equitably estopped from disputing whether the taxpayers had an apparent unrestricted right to the funds. But estoppel against the government is hen's-teeth rare, especially when, as in this case, the proposed estoppel involves public funds. See OPM v. Richmond, 496 U.S. 414, 426-27 (1990); see also Heckler v. Cmty. Health Servs. of Crawford Cty., Inc., 467 U.S. 51, 60 (1984) ("[I]t is well settled that the

---

[5] The Receiver argues that a 2004 district court ruling in the taxpayers' favor provides an indication that the taxpayers could reasonably have believed that they had an unrestricted right to the income at the time of receipt. But that ruling was reversed on appeal, see Zimmerman II, 409 F.3d at 479, and it has no bearing on the outcome of the collateral estoppel inquiry.

- 18 -

Government may not be estopped on the same terms as any other litigant.").

In all events, the estoppel argument is suggested in an off-handed manner, unaccompanied by any fully formed argument. Accordingly, we deem it waived. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

The Receiver's remaining argument is no more convincing. In it, the Receiver asserts that subsequent legislation, namely, a provision of the Pension Protection Act of 2006, 26 U.S.C. § 501(q), demonstrates that the taxpayers reasonably could have believed that they had an unrestricted right to the fraudulently derived income. This assertion, though, arrives too late: the finding of fraud was an essential element of a final judgment in an earlier proceeding, and the Receiver is bound by that result. See Manganella, 700 F.3d at 591, 594-95.

The Receiver has a fallback position, arguing that it can obtain a refund even though the taxpayers themselves could not. This argument tracks the district court's reasoning. Stressing that section 1341(a) was enacted to alleviate inequities, not to perpetuate them, the court concluded that Congress could not have intended to impute the taxpayers' fraud to the Receiver and thus deny relief to fraud victims. See Rob Evans, 9 F. Supp. 3d at 169-70. As a result, the district court determined that the Receiver can not only "step into [the taxpayers'] boots,

- 19 -

but it can also, as it were, knock the mud off them before putting them on."  Id. at 170.

This determination, which has the effect of giving the Receiver the benefits of the taxpayers' status without compelling the Receiver to shoulder any of the burdens of that status, weaves an equitable exception into the fabric of section 1341(a).  Such one-sided formulations are generally disfavored.  Cf. United States v. Tierney, 760 F.2d 382, 388 (1st Cir. 1985) ("Having one's cake and eating it, too, is not in fashion in this circuit.").  The text of the statute at issue does not support such a generous construction.

We review matters of statutory interpretation de novo.  See Medchem (P.R.), Inc. v. Comm'r, 295 F.3d 118, 122 (1st Cir. 2002).  Here, we start with the background principle that "income tax deductions and credits are matters of legislative grace."  Id. at 123.  "[D]eductions are strictly construed and allowed only 'as there is a clear provision therefor.'"  INDOPCO, Inc. v. Comm'r, 503 U.S. 79, 84 (1992) (quoting New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934)).  Section 1341(a)(5) is simply a method for calculating a deduction, so this principle controls.  See id.

Of course, the most reliable guide to the meaning of a statute is the statutory text.  See Conn. Nat'l Bank v. Germain, 503 U.S. 249, 253-54 (1992) ("We have stated time and again that courts must presume that a legislature says in a statute what it

means and means in a statute what it says there."). If the plain language of a statute elucidates its meaning, that meaning governs. The fact that the equities (real or perceived) may favor the taxpayer does not allow an inquiring court to distort the statute's plain meaning by importing its own notions of fairness. See Batchelor-Robjohns v. United States, 788 F.3d 1280, 1297 (11th Cir. 2015).

In this instance, Congress did not sound an uncertain trumpet, and we believe that the district court erred in refusing to follow section 1341(a)'s unambiguous textual mandate. Nothing in the discernable legislative intent justifies carving out a special exemption from the "unrestricted right" requirement for parties in either the Receiver's or the underlying plaintiffs' position. Indeed, the legislative history of section 1341 does not contain even a glimmer of a reason to think that the provision was intended to give the victims of a taxpayer's fraud a free pass around the "unrestricted right" requirement. The statute was plainly designed to alleviate an entirely separate problem: the plight of taxpayers who are inadequately compensated for taxes paid on income later restored. See H.R. Rep. No. 83-1337 (1954), reprinted in 1954 U.S.C.C.A.N. 4017, 4113; S. Rep. No. 83-1622 (1954), reprinted in 1954 U.S.C.C.A.N. 4621, 4751; see also Skelly Oil, 394 U.S. at 681.

We add that although section 1341 was enacted to alleviate a perceived inequity, the inequity that the Receiver deplores differs materially from the inequity that the statute was intended to correct. When a statute is aimed at addressing a particular inequity in the tax code, it does not follow that the statute may be interpreted to address every inequity attributable to the tax code. The opposite is true: when a statute's plain language permits only one interpretation, a court may not make an end run around that language by the simple expedient of pointing to the statute's equitable purpose. See Lopez-Soto v. Hawayek, 175 F.3d 170, 176 (1st Cir. 1999).

Relatedly, the Receiver — again echoing the district court — asseverates that we should refuse to impute the taxpayers' fraud to the Receiver because doing so "would not further the purpose of the fraud exception to recovery under [section] 1341." Rob Evans, 9 F. Supp. 3d at 169-70 (citing Cooper v. United States, 362 F. Supp. 2d 649, 656 (W.D.N.C. 2005)). This asseveration relies almost exclusively on the decision in Cooper, a case similarly configured but arising in the bankruptcy context, in which the court predicated its holding on the ipse dixit that public policy would not be "served by mechanically applying the statute." Cooper, 362 F. Supp. 2d at 655. In our view, Cooper is wrongly decided: the issue is not one of public policy but, rather, one of statutory construction. That issue, in turn, depends on

whether the taxpayer appeared to have an unrestricted right to the funds. See Culley, 222 F.3d at 1335-36. Such an unrestricted right is what the plain language of section 1341 requires. See id. at 1336; McKinney, 574 F.2d at 1243; see also Seggerman Farms, Inc. v. Comm'r, 308 F.3d 803, 808 (7th Cir. 2002) (declining "to disregard the plain language of the tax code" even if the code subjects taxpayers to "harsh tax consequences").

In a variation on the same theme, the Receiver says that its special status qua receiver justifies special treatment. See Rob Evans, 9 F. Supp. 3d at 170 (noting that "[c]ourts have exhibited a . . . disinclination to impute fraud to a receiver in the corporate context"). In support, the Receiver cites McGinness v. United States, 90 F.3d 143 (6th Cir. 1996). That decision is inapposite, though, because the court there specifically found that — unlike here — the receiver did "not stand in the place of the taxpayer." Id. at 146.[6]

### C. **The Receiver's Appeal.**

In its cross-appeal, the Receiver advances an entirely separate theory through which it endeavors to reach the same goal: to recover, for the benefit of the underlying plaintiffs, monies

---

[6] The Receiver's reliance on Scholes v. Lehmann, 56 F.3d 750 (7th Cir. 1995), is similarly misplaced. That case, which turns on Illinois law, see id. at 753-54, has no conceivable bearing on the proper interpretation of section 1341(a).

that the taxpayers paid to the IRS. The Receiver submits that the class action imposed a constructive trust on all monies that the taxpayers procured by fraud from the underlying plaintiffs. In the Receiver's view, this constructive trust was effectively retroactive, stripping the taxpayers of any entitlement to the fraudulently obtained funds from the moment those funds were paid over to them. Because the funds at all times remained the property of the underlying plaintiffs qua beneficiaries of the constructive trust, the Receiver's thesis runs, the government took that money from the taxpayers subject to the constructive trust and must return it now.

The district court deemed this argument waived, noting that the Receiver had neglected to make it before the magistrate judge. See Rob Evans, 9 F. Supp. 3d at 168. That ruling rested on a firm foundation: the law is settled that a litigant must put its best foot forward before a magistrate judge, and cannot introduce new arguments for the first time on the district court's review of the magistrate judge's ruling or recommendation. See Perez v. Lorraine Enters., Inc., 769 F.3d 23, 32 (1st Cir. 2014); Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co., 840 F.2d 985, 990 (1st Cir. 1988).

The Receiver acknowledges this rule, but labors to shift the trajectory of the debate. It says that it is absolved from a finding of waiver because it raised the constructive trust argument

both in its first amended complaint (filed after the district court's denial of the motion to dismiss) and in the joint motion for entry of final judgment. As the Receiver sees it, these references are sufficient to resuscitate the constructive trust argument and defeat the apparent waiver because the parties are appealing not from the decision on the motion to dismiss but from the final judgment.

This argument does not take the Receiver very far. The first amended complaint was filed as a preliminary step to tee up the case for appeal, that is, to ensure that the decision in the case covered all the tax years in dispute. The motion for entry of final judgment expressly acknowledged that no further deliberations were necessary because the district court already had decided "all disputed issues of law." This was unarguably a reference to decisions that had been made in the court's adjudication of the motion to dismiss. That fact is made crystal clear by the nature of the final judgment, which provides no new analysis but simply refers back to the denial of the motion to dismiss.

To sum up, the parties clearly intended to set the stage for appeals of the district court's ruling on the motion to dismiss. Their filings achieved this end and, for all practical purposes, the parties are now appealing the decision on the motion to dismiss. Although new claims may sometimes be raised for the

first time in an amended complaint, see Fed. R. Civ. P. 15(a), it was not appropriate for the Receiver, in the unique circumstances of this case, to raise new claims in the first amended complaint. After all, substance ordinarily ought to prevail over form, and it was too late at that time for the Receiver to inject into the case issues that had not been raised at the motion-to-dismiss stage. See B & T Masonry Constr. Co. v. Pub. Serv. Mut. Ins. Co., 382 F.3d 36, 40 (1st Cir. 2004); Rocafort v. IBM Corp., 334 F.3d 115, 121-22 (1st Cir. 2003).

The pivotal question, then, is whether the Receiver advanced the constructive trust theory at the appropriate time. The record makes manifest that the Receiver did not — and that omission constituted a waiver. See Paterson-Leitch, 840 F.2d at 990-91. In the last analysis, "[c]ourts are entitled to expect represented parties to incorporate all relevant arguments in the papers that directly address a pending motion." McCoy v. Mass. Inst. of Tech., 950 F.2d 13, 22 n.7 (1st Cir. 1991). Consequently, theories not timely raised in the trial court cannot be raised on appeal. See Teamsters, Chauffeurs, Warehousemen & Helpers Union, Local No. 59 v. Superline Transp. Co., 953 F.2d 17, 21 (1st Cir. 1992); McCoy, 950 F.2d at 22. So it is here.

To be sure, appellate courts may, in their discretion, "relax the raise-or-waive rule in order to prevent miscarriages of justice . . . in exceptional cases — cases in which 'the previously

omitted ground is "so compelling as virtually to insure appellant's success."'" Iverson v. City of Bos., 452 F.3d 94, 103 (1st Cir. 2006) (quoting United States v. Slade, 980 F.2d 27, 31 (1st Cir. 1992)). The Receiver's constructive trust argument, which posits a right to claw back monies paid to the federal fisc for lawfully levied taxes, does not come close to clearing that high bar. This is especially so where, as here, we already have rejected an attempt to apply essentially the same argument to private parties. Earlier, the Receiver attempted to use the constructive trust as a mechanism to claw back funds paid as fees for professional services "in the ordinary course of business and in exchange for fair value." Zimmerman V, 657 F.3d at 83. We rejected its claim, observing that "very little suggests that the order [creating the constructive trust] was intended to reach payments, made before the constructive trust was even imposed, to lawyers, accountants or the butcher, baker or candlestick maker." Id. at 84.

If anything, the constructive trust argument is even weaker in the circumstances of this case. Whether or not the taxpayers could be held liable to the underlying plaintiffs (the victims of their fraud) on a constructive trust theory seems to have nothing to do with the statutory procedure for obtaining tax refunds. By the same token, it strains credulity to suggest that the IRS was somehow under a constructive trust.

Stripped of the constructive trust argument, the Receiver's cross-appeal is impuissant,[7] and we reject it without further comment.

## III.  CONCLUSION

We need go no further.  For the reasons elucidated above, we sustain the government's appeal, reject the cross-appeal, reverse the judgment below, and remand for entry of judgment dismissing the tax-refund suit.  No costs.

**So ordered.**

---

[7] The Receiver's plaint about the size of the deduction allowed by the district court is of no concern.  See Rob Evans, 9 F. Supp. 3d at 170.  Because we have held that the Receiver is not entitled to any deduction at all, see text supra, we need not address this plaint.

**26 U.S.C. § 1341.  Computation of tax where taxpayer restores substantial amount held under claim of right**

    **(a) General rule.  If—**

        **(1)** an item was included in gross income for a prior taxable year (or years) because it appeared that the taxpayer had an unrestricted right to such item;

        **(2)** a deduction is allowable for the taxable year because it was established after the close of such prior taxable year (or years) that the taxpayer did not have an unrestricted right to such item or to a portion of such item; and

        **(3)** the amount of such deduction exceeds $3,000,

then the tax imposed by this chapter for the taxable year shall be the lesser of the following:

        **(4)** the tax for the taxable year computed with such deduction; or

        **(5)** an amount equal to—

            **(A)** the tax for the taxable year computed without such deduction, minus

            **(B)** the decrease in tax under this chapter (or the corresponding

provisions of prior revenue laws) for the prior taxable year (or years) which would result solely from the exclusion of such item (or portion thereof) from gross income for such prior taxable year (or years).

For purposes of paragraph (5)(B), the corresponding provisions of the Internal Revenue Code of 1939 shall be chapter 1 of such code (other than subchapter E, relating to self-employment income) and subchapter E of chapter 2 of such code.