JOSEPH A. BARRETT AND PAULINE C. BARRETT, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 3028-89.          Filed May 20, 1991.

*William T. Sherwood, Jr.,* for the petitioners.
*Ruud L. Duvall* and *Thomas M. Cryan,* for the respondent.

OPINION

FEATHERSTON, *Judge:* Respondent determined a deficiency in the amount of $22,001 in petitioners' Federal income tax for 1984. The issues to be decided are as follows:

1. Whether, under section 1341,[1] petitioners are entitled to a credit against their income tax for 1984 in an amount equal to the decrease in their income tax for 1981 attributable to the removal from 1981 gross income of $54,400, which was paid in 1984 to settle a claim asserted against petitioner Joseph A. Barrett for allegedly using insider information in buying and selling certain options to buy stock.

2. Whether petitioners are entitled to a deduction for 1984 of the amount of legal fees expended in resolving the dispute over the allegation that petitioner Joseph A. Barrett bought and sold options based on insider information.

All the facts are stipulated.

Petitioners, husband and wife, were legal residents of Bethesda, Maryland, when they filed their petition. They filed a joint income tax return for 1984 with the Internal Revenue Service Center in Philadelphia, Pennsylvania.

In 1984 and for some years previously, petitioner Joseph A. Barrett, hereinafter referred to as petitioner, was a shareholder in a stock brokerage firm located in Washington, D.C. On October 1, 1981, based upon advice provided by one of the brokers employed at his firm, petitioner purchased 146 options to buy stock of Santa Fe International Corp. Trading of the options was suspended the next day. Petitioner sold the options on October 6, 1981, for a total sales price net of commissions of $189,230.89. Petition-

---

[1]Unless otherwise indicated, section references are to the Internal Revenue Code of 1954 as amended and in effect for the year in issue. Rule references are to the Tax Court Rules of Practice and Procedure.

ers reported the transaction as a short-term capital gain of $187,223.39 on their income tax return for 1981.

Within 24 hours of the sale, on October 7, 1981, the Securities and Exchange Commission (SEC) contacted petitioner regarding possible insider information violations. The SEC was also concerned about eight or nine other brokers at petitioner's firm who may have purchased options on the basis of insider information. One broker outside of petitioner's firm was named by the SEC.

Petitioner testified before the SEC, and afterwards the SEC notified petitioner that it was instituting administrative proceedings to remove his brokerage license. Without his license, petitioner would have been unemployable as a broker. In addition, the SEC referred its administrative charges of possessing and acting upon insider information to the U.S. Department of Justice for criminal prosecution. Petitioner was required by subpoena to testify before a grand jury of the U.S. District Court for the District of Columbia. Subsequent to petitioner's testimony, the U.S. attorney declined to prosecute petitioner for insider trading or anything else.

As a result of the Government's actions but before the U.S. attorney declined prosecution, two groups of specialist market maker option brokers filed civil lawsuits against petitioner and several codefendants for $10 million, and demanded jury trials. At a hearing before a U.S. magistrate, the magistrate advised petitioner and his codefendants to settle the civil suits to avoid the hazards of litigation present in a jury trial, possible subsequent appeals which could result in very substantial legal fees, and adverse trial publicity which could hurt petitioner's brokerage business. While maintaining his innocence, petitioner joined his codefendants in 1984 in settling the civil suits by disgorging (repaying) $54,400 of his profit from the sale of the options. The day after the suits were settled, the SEC dropped all administrative proceedings to remove petitioner's brokerage license.

Petitioners' taxable income for 1981 was $193,950 and the associated tax liability was $94,046.67.

Petitioners claimed the $54,400 settlement payment on their 1984 income tax return as a Schedule C business

expense deduction under section 162. Respondent disallowed the deduction. Petitioners now contend that they are entitled to a 1984 credit, under section 1341(a)(5), equal to the 1981 tax attributable to the inclusion of $54,400 in their gross income for 1981.

Section 1341, on which petitioners rely for the disputed credit, is derived from the claim-of-right doctrine enunciated by the Supreme Court in *North American Oil Consolidated v. Burnet,* 286 U.S. 417, 424 (1932):

If a taxpayer receives earnings under a claim of right and without restriction as to its disposition, he has received income which he is required to [report on his] return, even though it may still be claimed that he is not entitled to retain the money, and even though he may still be adjudged liable to restore its equivalent. * * *

The Court explained that, if the taxpayer had been required to restore the equivalent of the money, he would have been entitled to a deduction for the year of the restoration. 286 U.S. at 424. In some situations, due to fluctuating income amounts or tax rates, a deduction in the year of the restoration would not make the taxpayer whole. In *Healy v. Commissioner,* 345 U.S. 278, 284-285 (1953), the Court recognized the potential inequities in such cases but held, nonetheless, that the annual accounting principle, despite the restoration of the claim-of-right amount in a later year, denies any adjustment for the year in which the income was received and reported.

Section 1341 was enacted to alleviate some of the harsh effects of the claim-of-right doctrine in such special situations. *United States v. Skelly Oil Co.,* 394 U.S. 678, 681 (1969). The section is, in pertinent part, as follows:

SEC. 1341(a). GENERAL RULE.—If—

(1) an item was included in gross income for a prior taxable year (or years) because it appeared that the taxpayer had an unrestricted right to such item;

(2) a deduction is allowable for the taxable year because it was established after the close of such prior taxable year (or years) that the taxpayer did not have an unrestricted right to such item or to a portion of such item; and

(3) the amount of such deduction exceeds $3,000,

then the tax imposed by this chapter for the taxable year shall be the lesser of the following:

(4) the tax for the taxable year computed with such deduction; or

(5) an amount equal to—

(A) the tax for the taxable year computed without such deduction, minus

(B) the decrease in tax under this chapter * * * for the prior taxable year (or years) which would result solely from the exclusion of such item (or portion thereof) from gross income for such prior taxable year (or years).

The manner in which section 1341 was intended to be applied was explained in the committee reports which accompanied its enactment:

> If the taxpayer included an item in gross income in one taxable year, and in a subsequent taxable year he becomes entitled to a deduction because the item or a portion thereof is no longer subject to his unrestricted use, and the amount of the deduction is in excess of $3,000, the tax for the subsequent year is reduced by either the tax attributable to the deduction or the decrease in the tax for the prior year attributable to the removal of the item, whichever is greater. Under the rule of the [*United States v.*] *Lewis* case (340 U.S. 590 (1951)), the taxpayer is entitled to a deduction only in the year of repayment. [H. Rept. 1337, to accompany H.R. 8300 (Pub. L. 591), 83d Cong., 2d Sess. A294 (1954); S. Rept. 1622, to accompany H.R. 8300 (Pub. L. 591), 83d Cong., 2d Sess. 451 (1954).]

Due to the manner in which this case was handled, there is a dispute as to which party has the burden of proof. According to respondent's briefs, petitioners, throughout the audit proceedings, adhered to the position that they are entitled to deduct the $54,400 repayment as a business expense. To the notice of deficiency is attached a lengthy "explanation of items" in which petitioners' claim to the business expense deduction is rejected. The explanation goes on to state that the claim-of-right doctrine applies but that petitioners failed to provide the information required under section 1341(a)(5) for the recomputation of the tax for 1981. From petitioners' briefs, it appears that the notice of deficiency first alerted petitioners to the possible applicability of section 1341(a)(5). In the petition, petitioners allege that respondent erred in disallowing the deduction claimed on their 1984 return and, alternatively, in denying a credit under section 1341 for the decrease in tax for 1981 produced by the elimination of $54,400 from 1981 gross income.

Notwithstanding the statement in the notice of deficiency that section 1341(a)(5) applies, respondent insists that petitioners have the burden of showing they have met all of the requirements of section 1341, because petitioners first claimed the credit in the petition. Respondent maintains that petitioners have not shown that they qualify for the section 1341(a)(5) credit. In our view, however, the stipulated facts establish that petitioners are entitled to the section 1341(a)(5) credit regardless of where the burden of proof rests.

As noted, the petition alleges that respondent erred in disallowing petitioners' deduction for 1984 for the restoration of $54,400 of the option profit. Sec. 1341(a)(4). In his opening brief, respondent took the position that, because the gain from the sale of the options was short-term capital gain, as reported in petitioners' 1981 return, any deduction of the $54,400 repayment for 1984 should be a capital loss deduction. In their briefs, petitioners limit their arguments to their claim to a section 1341(a)(5) credit. Such credit, it appears, would produce a lesser 1984 tax than would a 1984 deduction. We find it unnecessary, therefore, to deal with respondent's section 1341(a)(4) argument.

Respondent argues that petitioner has not "established" that, within the meaning of section 1341(a)(2), he "did not have an unrestricted right" to the $54,400 of the proceeds from the sale of the options, which amount he restored and here seeks to use as a foundation for the section 1341(a)(5) credit. Respondent contends that petitioner's liability was not litigated to judgment, that petitioner acquiesced in the settlement of the suit, and that he could not have been compelled to make the restoration. Respondent's brief summarizes his position as follows:

> In short, it is that which the plaintiffs [in the suits against petitioner and his codefendants] could have compelled, not that in which petitioner was willing to acquiesce, which controls. Petitioner was not compelled to pay out $54,400 by a judicial decree after a trial on the merits. He merely settled the lawsuits while he continued to deny his liability.

We hold for petitioners on this issue. As we understand section 1341(a)(2), the provision that the facts establish "that the taxpayer did not have an unrestricted right" to the item requires a showing that the taxpayer had a legal

obligation to restore the item. *Kappel v. United States,* 437 F.2d 1222, 1226 (3d Cir. 1971). Stated another way, "the payee must have at least the ability to legally compel the repayments before the repayments can be deducted by the payor." *Berger v. Commissioner,* 37 T.C. 1026, 1032 (1962). A voluntary restoration will not suffice.

To conclude that petitioner restored the $54,400 voluntarily without regard to any legal obligation would, in our view, be ludicrous. The SEC had initiated administrative proceedings in which it presumably sought, among other things, to compel a restoration of all of petitioner's option trading profit as well as the removal of his license as a broker. Petitioner along with others had been sued for $10 million. A hearing had been held in those suits before a U.S. magistrate who, it appears, was of the view that the plaintiffs could present sufficient evidence to require submission of the matter to a trial court jury. The magistrate urged the parties to settle the suits. With several other defendants involved, petitioner could not have known what evidence would be presented at a trial. He could not have known how the jury would view his own testimony and that of others on the circumstances in which he bought and sold the options. At this point, petitioner settled the suits and restored the $54,400. All of these facts clearly indicate that the settlement was made in good faith and at arm's length; there is no evidence to the contrary, and respondent does not suggest that the settlement was collusive. The settlement, whether or not embodied in a judgment, established the fact and the amount of petitioner's legal obligation. In the words of section 1341(a)(2), the settlement established in 1984 that petitioner did not have "an unrestricted right" to the $54,400 when he received it in 1981 even though he claimed that he had such right.

If the lawsuits against petitioner had been tried and judgments entered for $54,400, respondent seems to recognize that the judgments would have established that petitioner did not have an unrestricted right to that sum. See *Helvering v. Safe Deposit Co.,* 316 U.S. 56, 64-65 (1942). Even if the burden of proof here rests with petitioners, they would not have been required to present substantive evidence to show the correctness of the judgment. The same

is true of a bona fide, noncollusive, arm's-length settlement. The policy of the law is to foster the peaceful settlement of disputes without litigation. That "is not the less so even though one of the parties may have been in the right, or more nearly so than the other." 3 A. Corbin, Corbin on Contracts, sec. 620 (1960). Indeed, in *Skelly Oil Co. v. United States*, 394 U.S. 678 (1969), involving section 1341, the refunded amounts were arrived at through settlements, and no issue was raised as to whether it was established that the taxpayer did not have an unrestricted right to the refunded amounts. The settlements were accepted without comment as sufficient to establish that the taxpayer did not have such a right.

The landmark case of *Lyeth v. Hoey*, 305 U.S. 188 (1938), involved the question whether, for income tax purposes, an amount received by the taxpayer from his grandmother's estate was an "inheritance" within the meaning of the predecessor of section 102(a). The decedent's will left small legacies to relatives and her residuary estate to a charity. The taxpayer and others contested the will, alleging that the decedent lacked testamentary capacity and was subjected to undue influence. Similar to the proceedings before the magistrate in the instant case, the taxpayer, in accordance with local practice, asked the probate court to frame the issues for a jury trial and the taxpayer then satisfied the requirement that he show there was a genuine issue to be resolved. The probate court ordered a jury trial. At this point the case was settled, and the taxpayer received a substantial sum. The Supreme Court, without commenting on the evidence that might have been presented at a probate court trial, held that the taxpayer's receipts under the settlement had the same character as the claim actually pressed and settled, and thus held that such receipts were a nontaxable inheritance:

We think that the distinction sought to be made between acquisition through * * * a judgment and acquisition by a compromise agreement in lieu of such a judgment is too formal to be sound, as it disregards the substance of the statutory exemption. * * * [305 U.S. at 196.]

Under a wide variety of statutes, the courts have applied the *Lyeth v. Hoey* principle that good faith, noncollusive, or arm's-length settlements resolving disputed issues have

substantially the same effect as judgments, and payments pursuant to such settlements have the same character as the claims actually pressed. See, e.g., *Helvering v. Safe Deposit Co.,* 316 U.S. 56 (1942); *Farley v. United States,* 217 Ct. Cl. 560, 581 F.2d 821 (1978); *Estate of Minot v. Commissioner,* 45 T.C. 578 (1966); *Estate of Barrett v. Commissioner,* 22 T.C. 606 (1954); *Estate of Milner v. Commissioner,* 6 T.C. 874 (1946). We think the *Lyeth v. Hoey* principle is also applicable here where the settled dispute involves the taxpayer's unrestricted right to an "item" within the meaning of section 1341(a)(2).

Respondent's emphasis on petitioner's continued assertion that the $54,400 payment stemmed from no wrongdoing on his part is beside the point. In *Ridge Realization Corp. v. Commissioner,* 45 T.C. 508, 518-519 (1966), involving a claim by a reorganized successor corporation against the estate of a director of a predecessor corporation, this Court explained the *Lyeth v. Hoey* principle and added:

The theory that the nature of the amount received in a lawsuit settlement is governed by the nature of the claims asserted is not undermined by the fact that the Countess Bismarck may have been under the impression that the claims * * * were without any merit, and that she may have been impelled to initiate the settlement negotiations only by her desire to induce * * * [the taxpayer] to release its claims against her husband's estate and thus make his funds available to her. The facts that her need for the funds stimulated her to settle and that she is said to have believed the * * * action to be baseless no more alter the character of her payment to * * * [the taxpayer] than other labels attached to settlement payments or the typical statements by defendants that they do not admit any liability whatever but are settling in order to rid themselves of nuisance claims. * * *

We hold that the bona fide, arm's-length settlement between petitioner and the plaintiffs who sued him, pursuant to which he disgorged $54,400, establishes that he did not have an unrestricted right to that sum.

To support his position, respondent relies upon *Pike v. Commissioner,* 44 T.C. 787 (1965), which we find to be inapposite. In that case, the taxpayer, an attorney for an insurance company, received profits from the sale of stock of the insurance company. The State department of insurance asserted to the taxpayer that, under State law, the profits belonged to the insurance company, and the tax-

payer paid the profits over to the company. This Court denied section 1341 relief on the ground that the taxpayer failed to establish that he did not have an unrestricted right to the profits in the year of the restoration. In essence, the Court held that the taxpayer did not make the payment to the insurance company in recognition that he did not have an unrestricted right to the profits; the taxpayer's repayment was not compelled by legal process. Rather, the Court found as a fact that the taxpayer paid the money over to the insurance company "lest further controversy over the matter damage his status and reputation with the insurance industry and hence endanger his professional career, which was closely tied to that industry." 44 T.C. at 799. The case is thus distinguishable on its facts.

Turning to the second issue, petitioner paid legal fees of $17,721.79 in 1984 in defending himself from the SEC charges, including his appearance before the grand jury, and in defending and settling the civil lawsuits. Petitioners claimed a deduction under section 162 for the legal fees. Respondent disallowed the deduction. Petitioners apparently recognize that section 1341 provides no foundation for the deduction of legal fees, sec. 1.1341-1(h), Income Tax Regs., but here contend that the deduction for the legal fees should be allowed as claimed.

Section 162(a), on which petitioners rely, allows a deduction for all the ordinary and necessary expenses paid or incurred in "carrying on any trade or business." Section 212 allows a deduction for all the ordinary and necessary expenses paid or incurred "for the production or collection of income" without regard to whether the activity from which the income is derived is a trade or business. Section 212 does not create new categories of deductible expenses in addition to the section 162 deductions; it simply makes the old deductions applicable to new types of income-producing activities. *Boagni v. Commissioner,* 59 T.C. 708, 712 (1973), and cases cited therein. These sections, however, must be read in the light of section 263, which denies a deduction for "permanent improvements or betterments made to increase the value of any property or estate." By section 1.263(a)-2(c), Income Tax Regs., and corresponding prior regulations, section 263 has been interpreted for many years

to require the capitalization of the "cost of defending or perfecting title to property." "The non-deductibility of capital expenditures, founded upon the principle that related disbursements and receipts should be given consistent tax treatment, is * * * a basic limitation upon * * * [sections 162 and 212]." *Spangler v. Commissioner,* 323 F.2d 913, 918 (9th Cir. 1963), affg. a Memorandum Opinion of this Court.

Petitioner was not engaged in 1981 or 1984 in carrying on a trade or business of trading in options or other securities within the meaning of section 162(a). He was a broker. His buying and selling of securities on his own account was not a trade or business. See *Higgins v. Commissioner,* 312 U.S. 212 (1941). On their 1984 income tax return, petitioners reported numerous stock purchases and sales as capital transactions. In fact, on their 1981 return, petitioners reported the options purchase and sale profit here in dispute as a short-term capital gain. The legal fees were not paid or incurred in carrying on a trade or business.

Nor were the litigation expenditures paid or incurred in the production or collection of income within the meaning of section 212. In *Woodward v. Commissioner,* 397 U.S. 572 (1970), and *United States v. Hilton Hotels Corp.,* 397 U.S. 580 (1970), the Supreme Court enunciated the rule that in cases where litigation involves the acquisition or disposition of capital assets, as in the case of the options bought and sold by petitioner, the origin and character of the claim, rather than the taxpayer's primary purpose in litigating the claim, are the controlling criteria in deciding whether the expenditure should be deducted or capitalized. The origin of the claim litigated by petitioner was the purchase and sale of the options which, as noted above, was a capital transaction. Petitioner's expenses in that litigation must, therefore, be capitalized. *Locke v. Commissioner,* 65 T.C. 1004 (1976), affd. 568 F.2d 663 (9th Cir. 1978); *Wagner v. Commissioner,* 78 T.C. 910 (1982); see also *Bradford v. Commissioner,* 70 T.C. 584 (1978).

In sum, petitioners are entitled to a credit for 1984 in an amount equal to the decrease in tax for 1981 produced by removing short-term capital gain of $54,400 from their gross income for 1981. The legal fees of $17,721.79 in dispute may not be deducted for 1984 under either section

162 or 212, but must instead be treated as a capital expenditure. Respondent asserts, and petitioners do not contest, that if sections 162 and 212 are not applicable to the legal fees, petitioners are entitled to a short-term capital loss for 1984.

*Decision will be entered under Rule 155.*

