[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 17-14975

_____

D.C. Docket No. 2:16-cv-00741-SPC-MRM

NORA L. MIHELICK,

                                        Plaintiff - Appellant,

versus

UNITED STATES OF AMERICA,

                                        Defendant - Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(June 18, 2019)

Before CARNES, Chief Judge, and ROSENBAUM and DUBINA, Circuit Judges.

ROSENBAUM, Circuit Judge:

Inscribed above the main entrance of the Internal Revenue Service office in

Washington, D.C., is a quotation from Supreme Court Justice Oliver Wendell

Holmes Jr.: "Taxes are what we pay for a civilized society." *Civil servants at the IRS pursue an honorable mission*, Washington Post, https://www.washingtonpost.com/opinions/civil-servants-at-the-irs-pursue-an-honorable-mission/2018/07/24/75268f5e-8ea8-11e8-ae59-01880eac5f1d_story.html?utm_term=.61e3f74f5f8c, (last visited June 18, 2019). An admirable outlook, yet even Justice Holmes would likely agree that it is uncivilized to impose taxes on citizens for income they did not ultimately receive. But that is precisely the result the government asks us to uphold today.

When they were married, Nora Mihelick and her ex-husband Michael Bluso earned and paid taxes on income from Gotham Staple Company ("Gotham"). After the couple divorced, they learned they had to return $600,000 of the income they had received from Gotham. This meant that the couple had paid income taxes on $600,000 they turned out not to have.

Since the two had equally benefitted from and contributed to the income at issue, they agreed to split the liability evenly, consistent with Ohio law: Bluso would return $300,000 and Mihelick the other $300,000. So Bluso returned the full $600,000, and Mihelick reimbursed him for half that amount.

Then, under 26 U.S.C. § 1341—which allows a taxpayer who paid taxes on what he erroneously believed to be his income to recoup those unnecessary tax payments—Bluso recovered the taxes he had previously paid on the $300,000. But

2

when Mihelick tried to do the same thing for the taxes she had paid on the other since-returned $300,000, the government denied her request, simply because she had paid the money to Bluso instead of returning the money directly herself.

Under § 1341, though, Mihelick had just as much of a right to recover the taxes she previously paid on the $300,000 she received and then gave back as did Bluso to recover the taxes he paid on his $300,000 that he returned. So we reverse the district court's entry of summary judgment for the government and remand for further proceedings consistent with this opinion.

## I.    BACKGROUND

Petitioner Nora Mihelick and her ex-husband Michael Bluso married in Ohio in 1978. From 1999 to 2004, the couple lived in Ohio and worked at Gotham Staple Company, a closely held Ohio corporation owned by Bluso's family. Mihelick worked for the company, planning events, caring for and maintaining the homes of Bluso's parents, and handling administrative tasks. Bluso was the chief executive officer of Gotham at the time, and he eventually became majority shareholder as well. Both Mihelick and Bluso earned income for their roles at Gotham, and the couple filed joint tax returns that included Bluso's income during those years. The couple likewise paid taxes on the taxable income they earned from Gotham during that time.

3

In September 2004, Mihelick filed for divorce. While the divorce was pending, Pamela Barnes—one of Bluso's sisters, who was a minority shareholder at Gotham—sued Bluso, Gotham, and others. Among other things, Barnes claimed that Bluso had breached his fiduciary duties by excessively compensating himself at Gotham's expense.

Mihelick was not a party to the litigation, but Bluso wanted Mihelick to share any resulting liability from Barnes's lawsuit. To Bluso, Mihelick had also reaped the benefits of his compensation, so she should share the burdens of his compensation as well.

At first, Mihelick opposed the idea of sharing liability for the Barnes litigation—she wanted the separation agreement to provide that she was "not liable for anything that Pam Barnes comes up with." But when Bluso threatened to have a judge decide Mihelick's responsibility, Mihelick relented and agreed to share liability for the Barnes lawsuit.

After some back and forth between the parties about how to divide the liability, they agreed to Article 5 of their separation agreement, which provided that any liability from the Barnes litigation would be considered a marital liability for which Bluso and Mihelick would be jointly and severally liable. Specifically, the section clarified that the liability "arose all or in part from the acquisition of marital

4

assets," and that since the marital assets had been equally divided, the liability "shall be deemed to be a marital liability," too.

Mihelick and Bluso finalized their divorce on August 31, 2005, but the Barnes litigation continued. Eventually, in 2007, Bluso settled with Barnes. Under the terms of the settlement, Bluso disclaimed any wrongdoing but paid Barnes $600,000 to settle her excess-compensation claims.

After paying Barnes $600,000, Bluso took a tax deduction for $300,000. When asked whether he considered deducting the entirety of his $600,000 payment to Barnes, Bluso explained that he did not feel that it was right to do so, since Mihelick had to shoulder the burden of the other half of the $600,000 payment and since the couple had shared benefits and liabilities evenly during the marriage:

> [T]he divorce decree said she would have to pay back half of it since she, you know, benefited in half, and all these 1040s you gave me both my name and her name is on it. We both paid income tax on that. We paid income tax on her salary. She paid income tax on my salary. When I paid back the money to my sister, that was for excess compensation. I only felt that I was due $300,000 of it . . . .

Bluso accordingly looked to Mihelick to cover her half of the $600,000 liability, but Mihelick again resisted paying. So Bluso withheld alimony for a month and threatened to deprive her of more support. After contentious negotiations between Mihelick's lawyer and Bluso, and after Mihelick's lawyer advised her that

5

she had an "obligation" to pay, Mihelick finally acquiesced and paid Bluso $300,000 in 2009.[1]

In the meantime, Bluso successfully obtained tax relief for his $300,000 payment. Viewing herself in the same position as Bluso, Mihelick then sought tax relief for her $300,000 payment. On her 2009 tax return, she pursued a tax refund under 26 U.S.C. §§ 1341 and 165. But unlike what it had done with Bluso, the IRS denied Mihelick's claim for a refund. Mihelick sought relief in court. The district court agreed with the government and granted summary judgment against Mihelick. Mihelick now appeals.

## II.    STANDARD OF REVIEW

"We review de novo the grant of summary judgment and construe the evidence and draw all reasonable inferences in the light most favorable to the nonmoving party." *Ziegler v. Martin Cty. Sch. Dist.*, 831 F.3d 1309, 1318 (11th Cir. 2016).

## III.    DISCUSSION

Congress enacted § 1341 as a direct response to the Supreme Court's decision in *United States v. Lewis*, 340 U.S. 590 (1951). *Fla. Progress Corp. & Subsidiaries v. Comm'r*, 348 F.3d 954, 957 (11th Cir. 2003). Therefore, before we analyze

---

[1] Mihelick actually wrote a check for $323,700, but only $300,000 went to covering the overcompensation settlement.

Mihelick's § 1341 claim, we first briefly review *Lewis*, so we can be aware of the problem Congress set out to fix when it enacted § 1341.

In *Lewis*, a taxpayer reported a $22,000 bonus that he had received in his 1944 income statement. *Lewis*, 340 U.S. at 590. Two years later, it came to light that his bonus was improperly computed, so the taxpayer had to return $11,000 of that bonus. *Id.* The taxpayer tried to recalculate his 1944 taxes to reflect the fact that he had a bonus of only $11,000 that year, but the Supreme Court ruled that he could deduct $11,000 from his 1946 return only, not the 1944 one. *Id.* at 592.

Some felt the *Lewis* decision was unfair. For example, since factors like tax rates and income brackets may change from year to year, the taxpayer in *Lewis* still may have unnecessarily paid taxes on income that he turned out not to have. *See Fla. Progress*, 348 F.3d at 957; *Robb Evans & Assocs., LLC v. United States*, 850 F.3d 24, 30-31 (1st Cir. 2017). To remedy this perceived inequity, Congress enacted § 1341, the object of which is "to put the taxpayer in the same position he would have been in had he not included the item as gross income in the first place." *Fla. Progress*, 348 F.3d at 957.

To obtain relief under § 1341, a taxpayer must satisfy four requirements. First, an item of income must have been included in a prior year's gross income "because it appeared that the taxpayer had an unrestricted right to such item." § 1341 (a)(1). Second, the taxpayer must have later learned that she actually "did not have an

unrestricted right" to that income. *See* § 1341(a)(2). Third and fourth, the amount the taxpayer did not have an unrestricted right to must have exceeded $3,000 and be deductible under another provision of the tax code. *Fla. Progress*, 348 F.3d at 957, 959. If the taxpayer can demonstrate these elements, then she has a choice between two options: "[s]he can deduct the item from the current year's taxes, or [s]he can claim a tax credit for the amount [her] tax was increased in the prior year by including that item." *Id.* at 957.

In this case, no party disputes that the putative deduction exceeds $3,000. We therefore examine the remaining elements of § 1341, beginning with whether Mihelick appeared to have an unrestricted right to the relevant income. Next, we turn to whether Mihelick proved that she actually lacked an unrestricted right to that income. Finally, we study whether Mihelick can deduct her $300,000 payment under another provision of the tax code.

## A. **Mihelick appeared to have an unrestricted right to the income in question.**

The government contends that Mihelick did not appear to have an unrestricted right to the income in question. According to the government, Mihelick had no presumptive right to Bluso's income. And even if she did, the government asserts, Bluso could not have claimed an unrestricted right to the income he allotted himself from Gotham because those funds were misappropriated.

8

We address this two-part argument in reverse order, beginning with whether Bluso appeared to have an unrestricted right to the Gotham income. The government's position that he did not rests on its assumption that Bluso knowingly misappropriated money from Gotham. If a taxpayer stole or otherwise knowingly improperly acquired income, then he could not have a *sincere* belief that he had an unrestricted right to that income. *See, e.g.*, *Robb Evans*, 850 F.3d at 32 ("In short, section 1341(a)'s 'unrestricted right' language excludes all income reaped by taxpayers who know at the time of receipt that they have no right to the income."). But here, the record lacks any proof that Bluso knowingly misappropriated income, since his settlement agreement with Barnes expressly disclaimed any wrongdoing. Since we must take the facts in the light most favorable to Mihelick, the government's contention that Bluso did not believe he had an unrestricted right to his income necessarily fails.

The government's claim that Mihelick had no presumptive right to Bluso's income fares no better. First, even if the government's assertion were correct, it makes no difference to the § 1341 analysis. What matters is whether Mihelick sincerely believed she had a right to Bluso's income, not the correctness of her belief. *McKinney v. United States*, 574 F.2d 1240, 1243 (5th Cir. 1978)[2] ("The language of

---

[2] Decisions handed down by the Fifth Circuit by the close of business on September 30, 1981, are binding on this Court.

9

[§] 1341(a)(1), i.e.[,] 'because it appeared that the taxpayer had an unrestricted right to such item,' must necessarily mean 'because it appeared (*to the taxpayer*) that (he) had an unrestricted right to such item.'" (emphasis added)).  After all, if a taxpayer had to correctly believe that she had an unrestricted right to income to qualify for § 1341, then the taxpayer would have correctly paid her income taxes in the first place, and § 1341 would never come into play, since the second element of § 1341 requires a showing that the taxpayer did not, in fact, have an unrestricted right to the income.  So Mihelick did not need to be right that she had an unrestricted right to Bluso's income; she just needed to sincerely believe it.[3]

Looking at the facts in the light most favorable to Mihelick and making all reasonable inferences in her favor, we conclude that enough evidence in the record shows that Mihelick genuinely believed she had an unrestricted right to Bluso's income from 1999 to 2004, when the two were married.  The separation agreement, for example, reflected the couple's belief that each spouse had an equal right to the family income, as it provided that the marital property was to be divided equally

---

[3] The taxpayer need only subjectively believe that she was entitled to an item of income—even if some may consider her belief to be unreasonable.  As stated, the object of § 1341 is "to put the taxpayer in the same position he would have been in had he not included the item as gross income in the first place." *Fla. Progress*, 348 F.3d at 957.  The section does not discriminate between those who reasonably or unreasonably paid excess taxes—its aim is to return to the taxpayer excess taxes paid.  And this makes good sense:  no one would report and pay taxes on income to which she does not believe herself to be entitled, only to take the trouble of going through § 1341 to return herself to her starting position.

between Mihelick and Bluso and that each would be equally responsible for any liability arising from Bluso's compensation.

Second, the government is incorrect in any event in its assertion that Mihelick had no presumptive right to Bluso's income. Although Ohio is not a community property state, it does treat income from labor—as opposed to passive income—as marital property, and "[e]ach spouse shall be considered to have contributed equally to the production and acquisition of marital property." Ohio Rev. Code § 3105.171. Marital property is to be divided equally upon divorce, unless doing so would be inequitable. *Id.* So it appears that under Ohio law, Bluso's income was marital property, and Mihelick presumptively had an equal right to it.

Nor, as the government suggests, did the fact that Mihelick and Bluso did not initiate divorce proceedings until September 2004 preclude Mihelick from relying on § 3105.171's presumption as it related to Bluso's income from 1999 to 2004. The government argues that § 3105.171's presumption that the wife contributed equally to the couple's income during marriage applies only after the commencement of divorce proceedings. During marriage, the government contends, property rights of each spouse are different because under Ohio law, a husband or wife may take, hold, and dispose of property as if unmarried, and neither husband nor wife has any interest in the property of the other.

Essentially the government argues that Ohio acknowledges a spouse's contributions to and interest in the couple's marital estate only when a couple divorces, not when the couple is married. The only potentially precedential case the government cites for this contention is *State v. Garber*, 709 N.E.2d 218 (Ohio Ct. App. 1998). There, a wife was convicted for knocking out the windows of her husband's 1996 Dodge pickup truck. *Id.* at 218-19. She argued the truck constituted marital property under § 3105.171 and it was not criminal to damage her own property. *Id.* at 219. But the court in *Garber* disagreed and held that § 3105.171 applied only during divorce proceedings and that §§ 3103.04 and 3103.07, Ohio Rev. Code, which respectively provide that "[n]either husband nor wife has any interest in the property of the other" and that "[a] married person may take, hold, and dispose of property, real or personal, the same as if unmarried," meant that the truck, which was leased in the husband's name, was the husband's property. *Id.* at 617-18; Ohio Rev. Code §§ 3103.04, 3103.07.

We would normally follow *Garber* unless persuasive evidence indicated that the Ohio Supreme Court would rule otherwise. *Pendergast v. Sprint Nextel Corp.*, 592 F.3d 1119, 1133 (11th Cir. 2010). Here, there is. In fact, the Ohio Supreme Court has abrogated *Garber*'s discussion of §§ 3103.04, 3103.07, and 3105.171. A year after *Garber*, the Ohio Supreme Court explained that § 3103.04 has no applicability in criminal cases, since "[p]rivileges of a husband and wife with respect

12

to the property of the other were not meant to be enforced criminally and do not affect criminal liabilities." *State v. Lilly*, 717 N.E.2d 322, 326 (Ohio 1999). As §§ 3103.07 and 3105.171 are similarly civil statutes that deal with the privileges of husband and wife with respect to property, they too are inapplicable in the criminal context. So we are not bound by *Garber*'s interpretation of those statutes but by *Lilly*'s.

And after examining Ohio law, we are convinced that the Ohio Supreme Court would not hesitate to use § 3105.171, Ohio Rev. Code, to help define the property rights of married couples even absent a pending divorce. True, "[n]either husband nor wife has any interest in the property of the other." Ohio Rev. Code § 3103.04. And "[a] married person may take, hold, and dispose of property, real or personal, the same as if unmarried." *Id.* § 3103.07. But as the Ohio Supreme Court has explained, those provisions were largely designed to protect married women: at common law, "the wife was incapable of making contracts, of acquiring property, or of disposing of property without her husband's consent." *Lilly*, 717 N.E.2d at 325. "[T]o relieve the married woman from the disabilities imposed upon her as a femme covert by the common law," and to prevent the husband from just absorbing the wife's property as his own, the Ohio General Assembly enacted what is now § 3103.04, Ohio Rev. Code, to make sure that separate property of either spouse stays separate even after marriage. *See id.*

13

These provisions do not conflict with § 3105.171, Ohio Rev. Code.  Rather, § 3105.171 simply appreciates that spouses generally tend to work as a unit, with the efforts and sacrifices of one spouse assisting the other in earning a wage for the family.  So the provision treats income from labor as the fruit of the collective efforts of both spouses.  In short, Ohio Courts have long been able to maintain the integrity of separate property while crediting marital property that results from the efforts of either spouse during marriage.  *See Palmer v. Palmer*, 455 N.E.2d 1049, 1051 (Ohio Ct. App. 1982) (explaining that an increase in the value of separate property continues to be separate property, unless the increase was the "result of work furnished by either or both parties during the marriage," which would make the increase marital property).

And ironically, the government's suggestion to the contrary would require us to read § 3103.04, a provision conceived to protect married women, to curtail the scope of Ohio Rev. Code § 3105.171, which recognizes the traditional contributions of women during marriage.  We are persuaded that Ohio would not have recognized the contributions of each spouse to the marital estate during divorce proceedings only to inexplicably decline to recognize that reality while the couple remains together.

The upshot is that it appeared—correctly—to Mihelick that she presumptively had the same unrestricted right as Bluso to the income at issue in this case.

14

**B.** __It turned out that Mihelick did not have an unrestricted right to that income.__

The second element of a § 1341 claim requires the taxpayer to establish that, after the close of a taxable year, "the taxpayer did not have an unrestricted right" to some amount she initially reported as taxable income. To make this showing, the taxpayer must demonstrate that she involuntarily gave away the relevant income because of some obligation, and the obligation had a substantive nexus to the original receipt of the income. *See Batchelor-Robjohns v. United States*, 788 F.3d 1280, 1293-94 (11th Cir. 2015). Mihelick satisfies both requirements.

Mihelick involuntarily gave away $300,000 of the relevant income to which she previously believed she had an unrestricted right. We have explained that "payments made to settle a lawsuit" may constitute an involuntary obligation for § 1341 purposes. *Batchelor-Robjohns*, 788 F.3d at 1293-94 (citing *Barrett v. Commissioner*, 96 T.C. 713 (1991)).[4] In *Barrett*, two groups of securities brokers sued Barrett and several other shareholders at his brokerage firm after the Securities and Exchange Commission instituted administrative proceedings against the brokers for suspected insider-trading violations. *Barrett*, 96 T.C. at 715. At a hearing, the

---

[4] In *Batchelor-Robjohns*, we adopted *Barrett*'s reasoning as to what constitutes an involuntary obligation, but we did not adopt all aspects of *Barrett*. Part of *Barrett*'s reasoning rested on the distinction between taking a tax credit and a deduction under § 1341. *See Barrett*, 96 T.C. at 718. But in *Batchelor-Robjohns*, we ruled that the "deduction/credit distinction merely determines how to account for a § 1341 repayment on one's return, nothing more." *Batchelor-Robjohns*, 788 F.3d at 1297.

15

magistrate judge advised Barrett and his co-defendants to settle the suits to "avoid the hazards of litigation," "substantial legal fees," and "adverse trial publicity," all of which would be harmful for Barrett and his brokerage business. *Id.* Barrett heeded the magistrate judge's advice and without admitting wrongdoing, settled the civil suits for $54,000. *Id.* He then sought a tax credit through § 1341. *Id.* at 716.

The government fought Barrett's attempt to obtain the § 1341 credit. It argued that Barrett's payment was voluntary, so he failed to establish that he did not have an unrestricted right to the $54,000 he paid to settle the suits. *Id.* at 718. In particular, the government complained that Barrett "merely settled the lawsuits" while continuing to deny his liability and "was not compelled to pay out $54,000 by a judicial decree after a trial on the merits." *Id.*

The *Barrett* Court was unmoved by the government's arguments. It would be "ludicrous," the *Barrett* Court explained, "[t]o conclude that [Barrett] restored the $54,000 voluntarily without regard to any legal obligation." *Id.* at 719. Pointing out the risks that Barrett faced—losing his license, facing up to $10 million in liability, not knowing the type of evidence the plaintiffs wielded—and the fact that "[t]he policy of the law is to foster the peaceful settlement of disputes without litigation," *Barrett* held that the settlement was "made in good faith and at arm's length." *Id.* at 719-20. That good-faith settlement, "whether or not embodied in a judgment,

16

established the fact and the amount of [Barrett's] legal obligation" and showed that Barrett did not have an unrestricted right to the $54,000 for § 1341 purposes. *Id.*

Mihelick's situation is materially indistinguishable. As with Barrett, Mihelick's obligation to pay arose not from a final judgment, but from an agreement she entered in good-faith to avoid litigation. And it would be equally as "ludicrous"—as it was in *Barrett* to say that Barrett voluntarily paid his $54,000— to conclude that Mihelick voluntarily paid $300,000 of her income without regard to any legal obligation.

Indeed, Mihelick initially opposed paying Bluso for any liability arising from the Barnes lawsuit. Only after Bluso threatened her with litigation did she agree to be bound to do so and enter into Article 5 of her separation agreement. And even that did not occur without a battle: the parties actually negotiated Article 5 of the separation agreement—Bluso asked Mihelick to simply give him $150,000, but Mihelick turned down that offer because she judged that Barnes's lawsuit would not produce that much liability. Then, even after Bluso settled the Barnes lawsuit for $600,000 and attempted to collect $300,000 from Mihelick, she resisted paying, prompting Bluso to withhold alimony for a month.

Mihelick also paid an attorney to advise her of her rights, and that attorney told her that she had an "obligation" to pay Bluso. Under these circumstances—and particularly in light of the desirability of fostering settlements without litigation—

17

Mihelick did not need to wait to be sued before settling and paying for her payment to be considered involuntary. Because the record reflects Mihelick reasonably anticipated litigation and settled in good faith in the shadow of litigation, her $300,000 payment was involuntary for purposes of § 1341.

But as we have mentioned, that a payment is involuntary does not, in and of itself, suffice to show an unrestricted right to the money paid. Rather, the taxpayer must also show that the obligation to pay had a substantive nexus to the original receipt of the income. *Batchelor-Robjohns*, 788 F.3d at 1293.

Here, that substantive nexus between Mihelick's obligation to pay and the receipt of the original income is straightforward. As we have noted, the $300,000 of income in question was presumptively for Mihelick and Bluso's shared marital estate. *See supra* at Section III-A. But that Mihelick and Bluso took that $300,000 as income is also the very reason why Barnes brought her lawsuit—to recover that money because it was allegedly wrongfully dispensed to Bluso (and Mihelick) as income. And since Bluso and Mihelick agreed to split the $600,000 liability from Barnes's lawsuit over allegedly wrongfully paid income to Bluso (and Mihelick), Mihelick paid the $300,000 in settlement of the claim. So Mihelick's payment ultimately stemmed from the original receipt of the income at issue.

The government's attempts to convince us otherwise are unavailing.

The government first argues that the income from Gotham had nothing to do with Mihelick. But as we have explained, as a matter of Ohio law, the income was marital property to which Mihelick had a presumptive right.

Next, the government argues that Mihelick cannot satisfy the substantive-nexus requirement, because "[t]he terms of the couple's divorce agreement were negotiated many years after [Mihelick's] husband reported this income on the couple's joint federal tax returns." But the government has offered no reason why the passage of time alone should preclude a finding of a substantive nexus. That Barnes waited to sue does not change the fact that her lawsuit arose from the original receipt of income.

Finally, the government posits that "while [Mihelick's] payment may have incorporated funds traceable to the wages paid to [Mihelick's] ex-husband, the mere receipt of wage income does not establish a nexus under . . . § 1341 with every subsequent expense paid with that income." But this is a strawman argument: no party has argued that every expense traceable to income must—or even should—receive § 1341 treatment.

The government next suggests a new requirement that the taxpayer must meet. According to the government, a taxpayer lacks an unrestricted right to an item of income only if she returned the income to the "actual owner." Although the government cites no caselaw for support, its contention is not unprecedented. *See*

19

*Alcoa, Inc. v. United States*, 509 F.3d 173, 180-82 (3d Cir. 2007). Nevertheless, we decline to adopt a new requirement for this Circuit that lacks a basis in the statutory text and is inconsistent with § 1341's purpose—namely, returning the taxpayer who unnecessarily pays taxes on income she did not have to "the same position [s]he would have been in had [s]he not included the item as gross income in the first place." *Fla. Progress*, 348 F.3d at 957. It is sufficient on this record that Barnes effectively and reasonably claimed to be the rightful owner of the $300,000, and Bluso and Mihelick—who otherwise had a claim to be the rightful owners of the $300,000—agreed in a legally binding way not to challenge that.

## C. **Mihelick can deduct her $300,000 payment under another section of the tax code, namely, 26 U.S.C. § 165(c)(1).**

Finally, to qualify for § 1341 relief, Mihelick must show that her $300,000 payment is deductible under another provision of the tax code. *Fla. Progress*, 348 F.3d at 958-59. Mihelick can meet this element, as she can deduct her payment under 26 U.S.C. § 165(c)(1), which allows deductions for an individual's uncompensated "losses incurred in a trade or business" during the taxable year. 26 U.S.C. § 165(c)(1).

Under § 165(c)(1), a corporate officer may deduct the amount to settle a bona fide suit alleging mismanagement of corporate affairs, if the allegations are directly connected with the taxpayer's business activity. *See Butler v. Comm'r*, 17 T.C. 675, 679 (1951). In *Butler*, Butler was an officer of a company, and his wife had profited

from the purchase and sale of the company's bonds. *Id.* at 677, 679. The plaintiff in that case sued Butler and other fiduciaries of the company for an accounting of profits the officers and their close relatives had made from the purchase and sale of the company's bonds. *Id.* at 677. Butler settled the lawsuit and tried to deduct the amount of the settlement and corresponding legal fees from his tax return. *See id.* at 678. The IRS disallowed Butler's deduction, and Butler appealed. *See id.*

On appeal, the *Butler* Court noted that Butler was engaged in the business of acting as an officer to the corporation. *Id.* at 679. It then held that "payment in settlement of a suit for breach of trust or mismanagement of funds by a fiduciary, where the threatened litigation is bona fide, is deductible in those instances where the threatened litigation arises . . . out of the business of the taxpayer." *Id.* The court continued, explaining that allowing Butler's deduction would not frustrate public policy, since his settlement did not necessarily mean that he was guilty of breaching fiduciary duties or mismanaging funds—in Butler's case, neither side was entirely convinced that it would win, and Butler had settled "to prevent further damage to his business reputation." *See id.* at 680. Under those circumstances, the court allowed Butler to deduct the amount of his settlement because it arose from his business of acting as an officer for the company and allowing such a settlement would not frustrate public policy. *See id.* at 680-81.

21

The rule from *Butler* applies here.  As CEO and majority shareholder, Bluso carried out the trade or business of serving as a fiduciary and employee of Gotham. Barnes's lawsuit alleged that Bluso breached his fiduciary duty by misappropriating funds from Gotham as he was acting as CEO.  The two sides then settled the lawsuit. So the settlement payment was made "in settlement of a suit for breach of trust or mismanagement of funds by a fiduciary, where the threatened litigation is bona fide" and "arises . . . out of the business of the taxpayer."  *Butler*, 17 T.C. at 679.  And, like the case in *Butler*, there is no public policy issue with allowing the deduction because Bluso may well be innocent, since his settlement disclaimed wrongdoing. Thus, as was the case with the settlement amount in *Butler*, the $600,000 settlement here was deductible as a loss incurred in Bluso's business as a fiduciary.

Since Mihelick was presumed to have contributed equally to the production and acquisition of the income from Gotham, she also was presumed to have contributed equally to the ensuing $600,000 liability.  And the couple affirmed that presumption through their actions, as Mihelick did pay for her share of that liability. Because she paid for half the liability that she helped create, and because that liability was deductible under § 165(c)(1), Mihelick can take a deduction for her payment under § 165(c)(1).

This result reflects the reality that Mihelick made the actual payment to service the deductible liability and comports with the goal of having "[s]ubstance

22

and not mere form . . . govern in determining a deductible loss." 26 C.F.R. § 1.165-1.  Indeed, as far as we can tell, had Bluso sought relief for the entirety of the $600,000 payment under § 1341, he would have had no problem obtaining it.[5]  On this record, we cannot see why the result should differ, simply because post-divorce, Mihelick—who jointly paid taxes with Bluso on the $600,000 in the first place—separately sought relief for her $300,000 share of the payment.

## IV.    CONCLUSION

When viewed in the light most favorable to Mihelick, the evidence supports the conclusion that Mihelick satisfies all the elements of § 1341.  She is therefore entitled to survive summary judgment.  To reach the contrary conclusion would punish Mihelick for not being her husband and in the process, would create a tax windfall for the government.  We reverse the district court's grant of summary judgment for the government and remand to the district court for further proceedings consistent with this opinion.

On remand, the district court should ascertain whether any genuine dispute as to any factual issues necessary to resolve the inquiry on each of the § 1341 factors

---

[5] At oral argument, Chief Judge Carnes asked the government whether Bluso should have just taken the entire $600,000 deduction and then given half the benefit to Mihelick.  The government neither answered that question nor contested its premise.  *Oral Argument Recording for Nora Mihelick v. United States*, United States Court of Appeals for the Eleventh Circuit, http://www.ca11.uscourts.gov/oral-argument-recordings?title=&field_oar_case_name_value= mihelick&field_oral_argument_date_value%5Bvalue%5D%5Byear%5D=&field_oral_argument _date_value%5Bvalue%5D%5Bmonth%5D= (last visited June 18, 2019).

exists (*e.g.*, whether Mihelick believed that she had an unrestricted right to the income in question, and whether Mihelick paid Bluso to avert a lawsuit or because she felt legally obligated to do so after consulting her attorney).  If so, any dispute should proceed to trial.  And if there is no such factual dispute, the district court should enter judgment for Mihelick.

**REVERSED AND REMANDED.**